UNITED STATES of America,
Plaintiff,

v.

Kenneth E. GREEN, et al., Defendants.

No. CR–1–99–117–01.

United States District Court,
S.D. Ohio,
Western Division.

May 22, 2000.

David John Scacchetti, Cincinnati, OH, for defendants.

Kenneth L Parker, U.S. Attorney's Office, Cincinnati, OH, for U.S. Attorneys.

## ORDER

SPIEGEL, Senior District Judge.

This matter is before the Court on Defendant Kenneth Green's Motion to Suppress (doc. 70) and the Government's Response (doc. 75).

## BACKGROUND

In an Indictment dated December 15, 1999, the Government charged Defendants Kenneth Green, John Campbell, and Michael Lynce with conspiring to distribute and possession with the intent to distribute marijuana, a Schedule I Narcotic Controlled Substance, in violation of Title 21 U.S.C. §§ 841(a)(1), (b)(1)(B) and § 846 (doc. 9). Defendant Green and Defendant Campbell have pleaded not guilty to the charges (doc. 18) and are scheduled for

trial in this action on May 22, 2000 (doc. 76). This matter is now before the Court on Defendant Green's Motion to Suppress (doc. 70) and the Government's Response (doc. 75).

In his Motion, Defendant Green moves this Court to suppress the evidence that was seized from his residence located at 2017 Elm Street, Apartment No. 3, Cincinnati, Ohio (hereinafter, "Apartment No. 3") (doc. 70). Defendant Green alleges that a Federal Search Warrant was issued for the same address, but he asserts that this warrant only applied to Apartment No. 1 (hereinafter, "Apartment No. 1") (*see* doc. 70, Ex. 9.6). Specifically, Defendant Green contends that, since there was no exigent or emergency situation facing the agents investigating Apartment No. 3, they should have sought to obtain another search warrant for Apartment No. 3 (*Id.*).

In its Response, the Government argues that, even though the agents of the Drug Enforcement Agency (hereinafter, the "DEA agents" or "agents") on the scene did not have the "actual authority" to enter Apartment No. 3, the agents did obtain the "apparent authority" and "consent" from the owner of the apartment building to do so (doc. 75). Moreover, the Government asserts that, even if Defendant Green had a valid lease for Apartment No. 3, the agents on the scene reasonably concluded, from all of the available evidence before them at that time, that Defendant Green had abandoned Apartment No.3, and, therefore, the subsequent entry, search, and seizure were valid without a search warrant (*Id.*). The Government anticipates presenting in its case-in-chief the evidence obtained from the warrantless search of Apartment No. 3 in order to prove the drug conspiracy and possession charges against Defendant Green (*Id.*). Defendant Green moves this Court to suppress this evidence, arguing that the DEA agents lacked the valid consent that is a necessary prerequisite to entering his residence (doc. 70).

On April 26, 2000, the Court conducted an evidentiary hearing in this matter (hereinafter, "the hearing") (*see* doc. 77). Before discussing the testimony presented at this hearing, the Court believes a recitation of the facts in this case is necessary. In building a factual summary, we have examined the record, briefs, sworn testimony, and allegations of the Parties related to the seizure of the evidence found by DEA agents in 2017 Elm Street, Apartment No. 3 (*see* docs. 70, 75 & 77).[1]

Defendant Green, Defendant Campbell, and Defendant Michael Lynce were arrested by DEA agents on December 3, 1999 after Defendant Lynce allegedly dropped off approximately 116 pounds of marijuana at the Underground Nightclub, a Cincinnati nightclub allegedly owned by Defendant Green (doc. 75). A Federal Search Warrant was obtained for Defendant Green's nightclub and for Defendant Campbell's black 1986 Cadillac Sedan Deville parked in front of the nightclub on the same day as their arrest (doc. 75, Exs. 4.3 & 8.4). In the search warrant, the Government alleged that Defendant Campbell's Cadillac was one of the means Defendants used in transporting the marijuana from place to place (*Id.*). In addition, the Government asserts that the drop off point for the marijuana was usually the nightclub, or in the alternative, Defendant Campbell's Elm Street residence (*Id.*). Later that same day, the DEA agents were allegedly informed by a confidential informant that further evidence of drug activity and contraband would be found at Defendant Campbell's residence, located at 2017 Elm

---

1. In order for the Court to accurately reflect the record before us, as well as summarize the facts and issues in a coherent and narrative manner, the Court has scrutinized the Parties' briefs and testimony and summarized those facts in the "Background" section of this Order (*Id.*). The Court notes that most of the narrative facts were taken from the testimony given by the various witnesses at the April 26, 2000 suppression hearing (*see* doc. 77).

Street, Apartment No. 1, Cincinnati, Ohio (doc. 75, Ex. 9.6).

During the hearing, Special Agent Raymond Quijas, Jr. testified that, after Defendant Green was arrested, he was allegedly read, and eventually signed a voluntary waiver of, his *Miranda* rights (*see* docs. 75, Ex. 6 & 77). Agent Quijas further testified that, even after being specifically questioned about the location of his current residence, Defendant Green allegedly never admitted that his present or past residence was located at 2017 Elm Street, Apartment No. 3 (doc. 77). Rather, Agent Quijas stated that, during the course of the interrogation, Defendant Green allegedly revealed his present address as an apartment located on William Howard Taft Road in Cincinnati, Ohio (*Id.*).

On December 7, 1999, the agents obtained an additional Federal Search Warrant for Defendant Campbell's residence (*see* doc. 75, Ex. 9.6). On the same day the warrant was issued, the DEA agents arrived at Apartment No. 1 (*Id.*). They were greeted by a woman named Sabrina Ellis (doc. 75). According to Special Agent Brian Stine, once inside Apartment No. 1, the agents informed Ms. Ellis of their intention to conduct a search of the premises for any and all drug-related records, proceeds, and illegal contraband (docs. 75 & 77). Agent Stine then supplied Ms. Ellis with a copy of the search warrant for Apartment No. 1 and the agents on the scene began conducting a search of the residence (*Id.*). Sometime during the course of the search of Apartment No. 1, Ms. Ellis allegedly informed the agents that she was Defendant Campbell's girlfriend and that she lived at the apartment (doc. 75). Later, Ms. Ellis also allegedly volunteered to Special Agent Mike Mann that, prior to the agents' arrival, several individuals came to Apartment No. 1 and

moved a number of items from the apartment to an allegedly "vacant" apartment that was located above Apartment No. 1 (*Id.*). In addition, Ms. Ellis allegedly stated that she was not sure exactly what items the individuals had removed, but she was sure that she had not given them permission to do so (*Id.*).

While the agents were discussing this matter with Ms. Ellis, the maintenance man/manager of the apartment building, Jimmy Wilder, arrived at Apartment No. 1 (*Id.*). The agents allegedly explained their purpose for being there to Mr. Wilder by informing him that they were DEA agents with a search warrant looking for drug-related contraband in Apartment No. 1 (docs 75 & 77). The DEA agents later determined that Mr. Wilder lived in Apartment No. 2, which is located on the first floor of the apartment building (doc. 75).

Thereafter, Agent Stine allegedly asked Mr. Wilder if there were any "vacant" apartments upstairs in the building, and Mr. Wilder allegedly answered yes (*Id.*). According to Agent Stine, Mr. Wilder allegedly informed him that the now vacant upstairs apartment had been previously rented to Robert Green, Defendant Green's brother, but that Robert Green had moved out of the apartment over a month earlier and the upstairs apartment was now empty (*Id.*).[2]

Mr. Wilder then proceeded to take the agents to the upstairs "vacant" apartment that was later identified as Apartment No. 3 (*Id.*). Agent Stine testified that he could hear cat-like noises coming from inside Apartment No. 3, and he also noted that there was extensive damage and neglect to the front door of Apartment No. 3 (docs. 75 & 77). While standing in front of Apartment No. 3, Mr. Wilder allegedly restated that to the agents that Apartment No. 3 was "vacant" (doc. 75). In addition, he allegedly informed the agents of the

**2.** The Court notes that Defendant Green submitted into evidence a copy of a November 1999 phone bill from Cincinnati Bell listing Robert Green as a resident of "2017 Elm Street Flr. 2 Apt. Rear" (*see* doc. 75, Ex. 9.3). However, the phone bill does not specify which apartment on the second floor that Robert Green was residing (*Id.*).

building's "no pets" rule for any and all renters (*Id.*). Mr. Wilder also testified that he informed the agents that, even though the door appeared in a state of neglect, he was well aware of it prior to the agents' arrival and that the door was on his list of repairs (doc. 77).

During the hearing, Mr. Wilder's testimony was generally consistent with Agent Stine's testimony of their conversation (*see id.*). For example, Mr. Wilder testified that he knew that Robert Green had stayed in the upstairs apartment and that, as far as he was aware, no one else was "living" there as of December 7, 1999 (*Id.*). However, in contrast to Agent Stine, Mr. Wilder also testified that he never considered Apartment No. 3 to be "vacant," and he never gave the agents his "consent" to search the apartment (*Id.*).

Nonetheless, the Court notes that Mr. Wilder did not testify that he actually informed the agents on the scene that he believed Apartment No. 3 to be currently occupied or rented to Defendant Green or to any other tenant (*Id.*). In addition, Mr. Wilder stated that he knew who Defendant Green was because he witnessed Defendant Green paying the rent for "an apartment" at various times during 1999 (*Id.*). However, the Court notes that, once again Mr. Wilder never testified that he informed the agents on the scene of this fact or that he was aware that Defendant Green was renting Apartment No. 3 as of the day of the search (*Id.*). Moreover, it is undisputed that the agents' subsequent search of Apartment No. 3 was not conducted based on Mr. Wilder's "consent" to search the premises; instead, the search was allegedly based on the building owner's "apparent authority" to consent to the search (*see* docs. 75 & 77).

Once in front of the door to Apartment No. 3, the agents allegedly knocked on the door of Apartment No. 3 and announced their presence (doc. 75). No one answered (*Id.*). While outside Apartment No. 3 and at the request of the agents on the scene, Mr. Wilder used Agent Stine's cellular phone to contact the building's owner, Wallace Hawkins, and briefly discussed the situation as he knew it to be (docs. 75 & 77). According to Mr. Wilder, he only informed Mr. Hawkins that: (1) there were DEA agents alongside of him in front of Apartment No. 3; (2) the agents had a "search warrant"; and (3) the agents wanted Mr. Hawkins's consent to enter Apartment No. 3 (doc. 77). Upon finishing his discussion with Mr. Hawkins, Mr. Wilder allegedly told the agents that Mr. Hawkins gave the agents his verbal consent to enter and search Apartment No. 3 (docs. 75 & 77).

At this time, Agent Stine, as well as Supervising Agent Rich Cerniglia, spoke to Mr. Hawkins on the cellular phone (*Id.*). During the hearing, Agent Cerniglia testified that his purpose for speaking with Mr. Hawkins was to make sure that: (1) Apartment No. 3 was truly "vacant"; (2) no one was staying there or renting the apartment; and (3) to hear for himself that the building owner gave the DEA agents permission to enter Apartment No. 3 (doc. 77).

In addition, Agent Cerniglia testified that, at the conclusion of their phone conversation, Mr. Hawkins had assured him that Apartment No. 3 was "vacant," was not being rented, and that the agents had his permission to enter and search the premises for drug-related contraband (docs. 75 & 77). During the cross-examination, Agent Cerniglia conceded that he did not recall ever using specific legal terms such as "leasing or rental agreement" when talking to Mr. Hawkins, but he testified that he likely used common terms such as "occupancy" and "renting" in relation to Apartment No. 3 (doc. 77).

However, during direct examination by counsel for Defendant Green, Mr. Hawkins contradicted much of what Agent Cerniglia had earlier testified to in regards to several important points (*Id.*). First, Mr. Hawkins testified that he did not recall ever using the word "vacant" or "empty" to

describe the occupancy status of Apartment No. 3, and he was not sure when speaking to Agent Cerniglia if anyone was actually "living" in Apartment No. 3 at that time (*Id.*). Second, even though he was aware that Robert Green was apparently "subletting" Apartment No. 3 from his brother, Defendant Kenneth Green,[3] Mr. Hawkins testified that he recognized Defendant Green as the named and responsible tenant for Apartment No. 3 (*see* docs. 70, Ex. 2 & 77).[4] Third, Mr. Hawkins testified that, while he was on the phone with the agents, he had his rental ledger directly in front of him and the ledger clearly showed that, as of December 7, 1999, Defendant Green was paid up to date for his one-year lease of Apartment No. 3 (docs. 70, Ex. 1 & 77).[5]

In addition, Mr. Hawkins stated that he believed the DEA agents had a valid search warrant for Apartment No. 3, and, therefore, he cooperated with the agents and the search warrant by giving them his "consent" to enter and search Apartment No. 3 (doc. 77). Mr. Hawkins also stated that as of the day of the search and seizure, he never considered the apartment as "abandoned," "empty" or "vacant," and he considered Defendant Green as the rightful tenant of Apartment No. 3 (docs. 70 & 77). Moreover, Mr. Hawkins stated that, during his conversation with Agent Cerniglia, he never referred to the occupancy status of Apartment No. 3 as being under his "control and management" (doc. 77). Mr. Hawkins concluded his direct examination testimony by asserting that, "but for" the search warrant that he mistakenly believed covered Apartment Nos. 1 & 3, he would never have given his "consent" to search Apartment No. 3 (*Id.*).

However, during cross-examination by the Government, Mr. Hawkins's consistent and clear version of the telephone call with Agent Cerniglia, as well as the related circumstances of his "consent," became very muddled, confusing, and at times, contradictory (*Id.*). For example, Mr. Hawkins admitted that he could not specifically recall much of the conversation he had with Agent Cerniglia (*Id.*). In addition, even though Mr. Hawkins testified that he had his rental ledger in front of him while on the phone with Agent Stine and Agent Cerniglia, he never specifically testified that he actually told the agents that Apartment No. 3 was actually under a lease agreement with Defendant Green at the same time it was also being sublet to Robert Green (*Id.*). In fact, Mr. Hawkins's testimony often changed or conflicted depending on whether he was being examined by the Government or by Defendant (*Id.*). Moreover, Mr. Hawkins stated that he was only aware of Robert Green actually staying in Apartment No. 3 and, that he did not know at that time if or whether Defendant Green lived there at all (*Id.*). Mr. Hawkins concluded his cross-examination testimony by asserting that

3. During the hearing, Mr. Hawkins also testified that he routinely ignored the fact that his tenants often violated the rental agreement's "no sublet" rule as long as the rental payments were being made by the primary tenant in full and within a reasonable time (*Id.*). The Court notes that neither Party has submitted to the Court any written evidence of an actual sublet agreement between Defendant Green and Robert Green (*see* docs. 70, 75 & 77). The issue of Defendant Green's standing to contest the items seized in Apartment No. 3 was not raised in the Parties' briefs, nor was it directly raised as an issue to be decided before the Court during the hearing (*Id.*).

4. The Court also notes that, during the hearing, Defendant Green submitted into evidence

a "Residential Lease" for one-year occupancy signed by Mr. Hawkins and Defendant Green for "2017 Elm Street, 2nd Fl. Apt." on January 14, 1999 (doc. 70, Ex. 2). However, the lease agreement refers only to a rental for a 2nd floor apartment and does not specify as to which 2d floor apartment Defendant Green was actually renting in 1999 (*Id.*).

5. While it is true that the rental ledger lists Defendant Green as paying $350.00 per month during the course of 1999, there is no listing for Defendant Green's brother, Robert Green, who was allegedly subletting Apartment No. 3 from his brother with the tacit knowledge and consent of Mr. Hawkins (doc. 70, Ex. 1).

he was not exactly sure of the actual date Defendant Green paid the December 1999 rental payment or whether the payment was on time or late, since he did not routinely penalize late rental payments (*Id.*).

Nevertheless, the Court finds that Mr. Hawkins was consistent throughout his testimony on several important points (*Id.*). For instance, Mr. Hawkins was consistent when he directly contradicted Agent Cerniglia's testimony that he told the agent that Apartment No. 3 was "empty," "vacant," or otherwise "abandoned" (*Id.*). Mr. Hawkins also testified that, when he was told by either the agents on the scene or Mr. Wilder that there was a search warrant, he allegedly assumed that the warrant covered Apartment No. 3, so he did not question the reason, purpose or scope of the warrant (*Id.*). Moreover, Mr. Hawkins testified that, as of December 7, 1999, he knew that Defendant Green was not considered "late" or in default in relation to his rental payment for Apartment No. 3, but he could not specifically recall whether he informed Agent Stine or Agent Cernigila of this important fact (*Id.*).

Once the agents received Mr. Hawkins's "consent" to enter and search Apartment No. 3, they allegedly observed, in plain view, partially-smoked marijuana cigarettes, drug residue, balance scales, shotgun shells, and more importantly, a drug ledger that can allegedly be linked to Defendant Green (docs. 75 & 77). After the visual search of the sparsely-furnished apartment, the agents then conducted a more thorough manual search (*Id.*). At the conclusion of the search, Agent Stine called Mr. Hawkins back to inform him of what they had observed and what evidence they had collected (*Id.*). Mr. Hawkins allegedly informed Agent Stine to remove any illegal substances or drug-related paraphernalia from the apartment (*Id.*). Thereafter, Agent Stine left an inventory of the items seized in Apartment No. 3 with Mr. Wilder before leaving Apartment No. 3 (doc. 75).

## DISCUSSION

The Fourth Amendment states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The controlling standard of the Fourth Amendment is reasonableness. *See Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) ("It is axiomatic that a nonconsensual search, by the police, of private property, is *per se* unreasonable unless it has been authorized by a valid search warrant, subject to only a few specifically established and well-delineated exceptions.").

 "The Fourth Amendment generally prohibits the warrantless or non-consensual entry of a person's home, whether to make a routine felony arrest or to search for specific objects." *Payton v. New York,* 445 U.S. 573, 584–85, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). Although there are specifically established exceptions to that general rule, the government bears the burden of showing, once a warrantless search has occurred that the government's conduct was within one of the recognized exceptions and was reasonable. *United States v. Jeffers,* 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59 (1951). For example, the prohibition does not apply to situations in which voluntary consent has been obtained from a third party who possesses common authority over the premises. *See United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (upholding the seizure of incriminating evidence by federal agents from a warrantless search of defendant's hotel room once he had "abandoned" the room by checking out of the hotel and after the agents had re-

ceived the consent of the hotel's management to search his former room).

 Furthermore, while a landlord generally lacks the "common authority" to consent to a search of a tenant's apartment, a tenant who "abandons" the property loses any reasonable expectation of privacy he once had. *Abel v. United States*, 362 U.S. 217, 241, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960). Moreover, a third party's consent to search an area is valid if he has mutual use of it, with joint access to or control of the area for most purposes. *United States v. Matlock*, 415 U.S. at 171, 94 S.Ct. 988 n.7. In addition, even if the consenting party does not, in fact, have the requisite relationship to the premises, "there is no Fourth Amendment violation if an officer has an objectively reasonable, though mistaken, good-faith belief that he has obtained a valid consent to search the area." *Illinois v. Rodriguez*, 497 U.S. 177, 186, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).

 In *United States v. Jenkins*, 92 F.3d 430, 436 (6th Cir.1996), the Sixth Circuit set forth the following principle in regards to a third person's "apparent authority" to consent to a search of another's premises:

> When one person consents to a search of property owned by another, the consent is valid if "the facts available to the officer at the moment ... warrant a man of reasonable caution in the belief that the consenting party had authority over the premises."

*Id.* at 436 (quoting *Rodriguez*, 497 U.S. at 188, 110 S.Ct. 2793). "A warrantless search is valid when the officer has relied on a person's apparent authority and the officer's reliance was in good faith based on all of the facts known by the officer at the time of the search." *Rodriguez*, 497 U.S. at 188–89, 110 S.Ct. 2793.

The Court in *Rodriguez* held that the officer's belief that a person has the authority to consent "is the sort of recurring factual question to which law enforcement officials must be expected to apply their judgment, and all the Fourth Amendment requires is that they answer it reasonably." *Id.*, 497 U.S. at 186, 110 S.Ct. 2793. Specifically, the Supreme Court stated that, "what a defendant is assured by the exclusionary rule, where it applies, is that no evidence seized in violation of the Fourth Amendment will be introduced at his trial unless he consents." *Id.* at 183, 110 S.Ct. 2793. However, what a defendant is assured by the Fourth Amendment "is not that no government search of his house will occur unless he consents; but that no such search will occur that is unreasonable." *Id.* In addition, the Supreme Court in *Rodriguez* explained that, what is at issue when a claim of "apparent consent" is raised is not whether the right to be free of searches has been waived, "but whether the right to be free of unreasonable searches has been violated." *Id.* at 187, 110 S.Ct. 2793.

A court reviewing a defendant's motion to suppress must be viewed in a light most favorable to the government. *United States v. Wellman*, 185 F.3d 651, 655 (6th Cir.1999); *United States v. Williams*, 962 F.2d 1218, 1221 (6th Cir.1992). Having reviewed this matter in the light most favorable to the Government, the Court finds that the evidence adduced at the April 26, 2000 suppression hearing supports the Government's view of the facts for several reasons.

First, after the arrest of Defendants Green, Campbell and Lynce, the DEA agents received confidential information that further drug contraband would be located at Defendant Campbell's residence located at 2017 Elm Street, Apartment No. 1. However, during the course of his initial interrogation, Defendant Green informed the agents that he actually lived on William Howard Taft Road, and not on Elm Street. Second, when the agents arrived on Elm Street, Ms. Ellis told the agents that the items removed from her apartment were now located in a "vacant" apartment situated on the floor above

Apartment No. 1 and later identified as Apartment No. 3. Third, it was at this time that Agent Stine inquired broadly to Mr. Wilder whether there were any vacant apartments upstairs, and Mr. Wilder specifically escorted them to Apartment No. 3. Moreover, Mr. Wilder had the opportunity to inform the agents that Apartment No. 3 may have been rented to Robert Green or Defendant Green, but he allegedly did not do so at that time.

Next, as to the most important portions of Agent Stine's and Agent Cerniglia's testimony, Defendant Green's witnesses did not specifically contradict the agents' testimony in relation to the circumstances that were present before them on December 7, 1999. Instead, Defendant Green's witnesses gave favorable testimony to both sides, depending on which Party was conducting the examination. Fifth, when the agents on the scene were informed by Ms. Ellis of the possibility that drug-related evidence had been removed from Apartment No. 1, which was subject to a search warrant, to Apartment No. 3, which was not, the agents chose to act deliberately and cautiously while investigating the occupancy status of Apartment No. 3. For example, only after speaking to Ms. Ellis, Mr. Wilder, and Mr. Hawkins about the occupancy status of Apartment No. 3, did they proceed forward with the search and seizure. Sixth, the testimony is uncontradicted that the agents heard some cat-like noises from inside Apartment No. 3, that they observed a front door that was in disrepair, and that the totality of the circumstances and the outward appearance of Apartment No. 3 gave the agents an objective belief that the apartment was indeed "abandoned."

In addition, although Mr. Hawkins testified that he knew Apartment No. 3 was rented to Defendant Green and that he had his rental ledger in front of him showing that the rental payment for Apartment No. 3 was up to date, he could not specifically recall whether he actually told Agent Stine or Agent Cerniglia of these two very

relevant facts. On the contrary, Mr. Hawkins stated that, once he was informed by Mr. Wilder that DEA agents were on the scene with some kind of "search warrant," he felt that he had no choice but to allow them to search Apartment No. 3. Finally, even though Mr. Hawkins testified that he never stated that Apartment No. 3 was "empty," "vacant" or "abandoned," he also could not specifically recall whether he told the agents that the apartment was rented, leased, or otherwise occupied. What is more important is that neither Mr. Hawkins nor Mr. Wilder testified that they informed any of the DEA agents on the scene that Apartment No. 3 was presently being leased to Robert Green, Defendant Green, or to anyone else.

Whether in fact true or not, we believe that Agent Stine's and Agent Cerniglia's beliefs that Apartment No. 3 was vacant was "objectively reasonable" based on the facts provided to them as of December 7, 1999. *See United States v. Sledge,* 650 F.2d 1075, 1079–80 (9th Cir.1981) (holding that the law enforcement agent had an objectively reasonable belief that the premises were abandoned because: (1) the landlord, based on direct observation, told the agent that they were and (2) this was consistent with the agent's own observations and knowledge of the case); *see also United States v. Brazel,* 102 F.3d 1120, 1149 (11th Cir.1997) ("Whether or not correct, we believe that the officer's belief that the premises were vacant was 'objectively reasonable' on the facts provided to him, which were consistent with his own knowledge of the case.").

Furthermore, we find that any "mistake" made by the agents on the scene relating to whether the premises were vacant was a mistake of fact, not one of law. *Brazel,* 102 F.3d at 1149. In addition, even if there was a mistake of fact on the agents' part, we must also find that this mistake was at least partially due to the conversations that took place between the agents, Mr. Wilder and Mr. Hawkins, as well as Defendant Green.

Even the Court found it difficult to follow the testimony of Mr. Hawkins as to what was said to the agents and what was not said. Therefore, we conclude that, if there was a mistake of fact in this matter, it was a mistake on the part of the agents, Mr. Wilder, Mr. Hawkins, and Defendant Green. *See Brazel*, 102 F.3d at 1149 (affirming the district court's admission of incriminating evidence that was seized without a warrant from defendant's apartment pursuant to the "apparent authority" and consent of the landlord). It is certainly true that the he agents on the scene could have been more clear and explanatory in their conversations with Mr. Wilder and Mr. Hawkins. Likewise, Mr. Wilder and Mr. Hawkins should not have assumed certain facts to be true without further inquiry, and they also should have informed the agents of the possibility that either Robert Green or Defendant Green was renting Apartment No. 3, prior to giving the agents their "consent" to enter the apartment. *See Rodriguez*, 497 U.S. at 186, 110 S.Ct. 2793 ("The Constitution is no more violated when officers enter without a warrant because they reasonably believe that the person who has consented to their entry is a resident of the premises, than it is violated when they enter without a warrant because they reasonably believe they are in pursuit of a violent felon who is about to escape."); *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) ("Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability.").

This Court finds that the totality of the circumstances known to the DEA agents before they searched Apartment No. 3 would objectively indicate to a reasonable officer in like circumstances that the apartment was either vacant or abandoned. In addition, this Court finds that Agent Stine's and Agent Cerniglia's conduct, search, and seizure of Apartment No. 3 were also objectively reasonable under the circumstances that were before them on December 7, 1999. Moreover, we find that Agent Cerniglia reasonably concluded that Mr. Hawkins had the "apparent authority" to consent to the entry, search, and seizure of the allegedly incriminating items found in Apartment No. 3. Therefore, this Court concludes that the items seized by the DEA agents in Apartment No. 3 were obtained by a valid consent, search, and seizure of the premises.

## CONCLUSION

Accordingly, for the reasons set forth above, the Court hereby DENIES Defendant Green's Motion to Suppress (doc. 70).

SO ORDERED.