977 So.2d 1030 (2008)
STATE of Louisiana
v.
Patrick W. VEALS.
No. 07-KA-605.
Court of Appeal of Louisiana, Fifth Circuit.
January 22, 2008.
*1032 Paul D. Connick, Jr., District Attorney, Twenty-Fourth Judicial District, Parish of Jefferson, Terry M. Boudreaux, Thomas J. Butler, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Margaret S. Sollars, Attorney at Law, Louisiana Appellate Project, Thibodaux, Louisiana, for Defendant/Appellant.
Patrick Veals, Kinder, Louisiana, pro se.
Panel composed of Judges THOMAS F. DALEY, WALTER J. ROTHSCHILD, and FREDERICKA HOMBERG WICKER.
WALTER J. ROTHSCHILD, Judge.
Defendant, Patrick Veals, was charged by amended bill of information along with co-defendants with three counts of armed robbery, violations of LSA-R.S. 14:64.[1] At his arraignment, defendant pled not guilty to all charges. Defendant's motions to suppress evidence, identification, and statement were denied by the trial court. Following a jury trial, defendant was found not guilty as to count one, and guilty as charged as to counts two and three. He was sentenced to fifteen years on each count, to run concurrently with each other. Defendant was granted an out-of-time appeal and now asserts three assignments of error by counseled and pro se briefs. He also requests a review of the record for errors patent.
FACTS
In count three of the amended bill of information, defendant was charged with armed robbery of Peter Bui. Mr. Bui testified at trial that during the late afternoon of April 1, 2003, he was cleaning his car at a carwash on Behrman Highway when a black man pointed a gun at him and said, "Give me whatever you have." Bui gave the man his wallet, which contained some credit cards and a casino card. The gunman then turned and ran from the scene. A second man  who had been hiding out of Bui's view up to that point  fled along with him. Bui testified that one of the men ran through some bushes and into a nearby apartment. The second man continued to flee on foot.
At trial Bui testified he could only see the gunman's eyes and mouth, as the rest of the man's face was covered by a darkcolored ski mask. According to Bui, the gunman was five feet, five inches to five feet, seven inches tall, and weighed 135 to 140 pounds. The second marl was taller than the gunman.
Bui testified that carwash employees called police to report the robbery. Officers arrived at the scene 10 to 15 minutes later. Deputy Anthony Green of the Jefferson Parish Sheriffs Office (JPSO) testified he was the responding officer. He interviewed Bui, who reported he had been robbed at gunpoint by two individuals who had taken his wallet and then fled into a wooded area behind the carwash. Green wrote the initial police report in the matter. Bui described the gunman's clothing to Green as dark jeans, a dark hooded jacket, and a hat. Bui did not say anything to Green about a ski mask.
Detective Dax Russo of the JPSO's robbery division testified he reported to the *1033 scene of the carwash robbery at 835 Behrman Highway. Russo interviewed Mr. Bui, who gave him information about the suspects and about his stolen credit cards. Bui told Russo the gunman wore dark clothing and a ski mask.
Bui identified state's exhibits of photographs of cards that were in his wallet when it. was stolen, including a photograph of the Hibernia banking card.
Russo testified that several days after the carwash robbery, Bui notified him there had been some activity on his stolen credit cards. Based on that information, Russo went to Albertson's supermarket on Belle Chasse Highway and met with Jared Hemler, a store manager. Hemler gave Russo an electronic journal report of a purchase in the amount of $80.98 made with one of Bui's bank cards. Russo testified that based on information he obtained at Albertson's, he instituted a search for a tan or beige older model foreign car.
Russo also obtained documentation from Wal-Mart on Behrman Highway of a purchase made there using one of Bui's cards. Wal-Mart's loss prevention manager gave Russo the surveillance tape of the purchase, and the detective created some still photographs from the videotape.
Russo further testified that he obtained surveillance videotape from Algiers Bank and Trust, located inside of a Winn-Dixie supermarket on Holiday Drive in New Orleans. The tape depicted subjects attempting to use Mr. Bui's bank card to obtain money from an ATM machine. The detective made still photographs from the surveillance tape. One of the still photographs from the surveillance tape was date and time stamped April 1, 2003, at 10:27 p.m.
In count two of the bill of information, defendant was charged with armed robbery of Michael Crawford. Mr. Crawford testified he is a maintenance supervisor at Cedarwood Apartments on Park Place. On the night of April 2, 2003, he received an emergency call from one of the apartments. When he drove to that apartment, and found that two men were standing in front of it. Both men had something white covering their faces. One of them pulled a black revolver on him. The men ordered Crawford to drop what he had and to turn around. Crawford dropped his wallet on the ground, then turned and ran. Crawford testified his wallet contained his identification, credit cards, and $20.00 in cash.
Crawford alerted police to the robbery immediately. Deputy Roy Gorman testified that he reported to the scene at 2350 Park Place in Gretna. Gorman interviewed Crawford and completed a police incident report. Gorman testified that Detective Russo did the follow-up investigation on the case. Crawford was never able to identify the perpetrators, since he did not see the men's faces.
In count one of the bill of information  on which defendant was ultimately acquitted  defendant was charged with armed robbery of Teresa Hoang. Ms. Hoang testified that on April 8, 2003, she was working the afternoon shift at the Quality Inn Hotel on the Westbank Expressway in Gretna. She was alone at the front desk when a man entered and used the lobby telephone. Just after that man left the hotel, a second man entered, wearing a handkerchief across his face. She could only see the man's eyes. The man pointed a gun at her head and ordered her to shut up and give him the money in the cash register. After she opened the cash register the man pushed her to the floor and said, "Shut the f* *k up before I shoot you." After the gunman took the money from the register, he dragged Hoang to the hotel's safe and told her to open it. She told him she did not know the safe's *1034 code. Continuing to point the gun at her, the man said, "Shut the f* *k up."
Hoang testified she could only see the barrel of his gun, and that it was black. Hoang said there was only 50 to 100 dollars in the cash register at the time of the robbery. She surmised that the man who entered the lobby to use the telephone prior to the robbery was with the gunman.
After the gunman left, Hoang called 9-1-1 to report the robbery. Detective Randy Thibodeaux testified that he responded to the call. Ms. Hoang told him the gunman had brown eyes, curly black hair, and wore dark colored jeans and black tennis shoes. The man wore a bandanna. Detective Thibodeaux testified that Hoang described a second man who used the telephone in the lobby just before the robbery, but that she was unsure about whether the second man was connected to the gunman.
Detective Russo testified that based on information he received from a witness named Brignac at the Quality Inn, he set out to find an older model beige or tan Mercedes automobile. He decided that since the three robbery locations and the stores where the stolen cards were used were all in the same general vicinity, he would drive around that area and look for a car that fit that description. Officers located an older Mercedes meeting the description on East Monterey or West Monterey. They canvassed the neighborhood to uncover the identity of the car's owner. They learned from the police computer that the car belonged to John Williams.
Russo testified that they located Williams and advised him of his Miranda rights.[2] Williams agreed to waive his rights and speak with officers. Williams also completed consent forms allowing officers to search his car and his residence.
Russo testified that they located items purchased at Albertson's with Mr. Bui's bank card, including Johnny Walker, Red. Label, Taaka Vodka, and a case of Bud Light beer. Officers then made contact with Patrick Wooten, an acquaintance of defendant's.
Patrick Wooten testified that in April, 2003, he lived in Monterey Court in Terrytown, a subdivision close to Behrman Highway. He knew John Williams, Walter Cosse, and defendant. Wooten testified that he recognized the cards pictured in the State's exhibits and that he also recognized the .22 caliber handgun in the State's evidence. Wooten said defendant brought those items to his house and asked him to hold them for him. Defendant returned 15 minutes later to retrieve the gun. Wooten saw that the cards did not belong to defendant. Sergeant Larry Dyess, whom Wooten has known for three to four years, confiscated the cards sometime in April, 2003. The sergeant asked Wooten about the robbery suspects, and where they lived. When questioned at trial about whether defendant told him where he had obtained the cards, Wooten invoked his Fifth Amendment right against self-incrimination.
Wooten intimated that he had been threatened by members of defendant's family who did not want him to testify against defendant at trial. He testified that if he told the truth at trial, his neck would be on the "chopping block."
Detective Russo testified that he learned defendant was staying at the home of his girlfriend, Aniquia Lowe. Russo and Sergeant Dyess went to the Lowe residence at 936 West Monterey Court, Apartment B, and knocked on the door. Aniquia answered the door and allowed the officers to enter the apartment. The officers learned *1035 defendant was in a bedroom. They brought him from the bedroom to the front room of the apartment and advised him of his rights.
When Aniquia's mother, Shandrika Lowe, arrived, the officers obtained her written consent to a search of the residence. Russo asked defendant whether there was any clothing in the apartment that he had worn at the time of the carwash robbery, and defendant pointed out a black Girbaud t-shirt. The Wal-Mart surveillance video taken hours after the robbery depicts defendant wearing that shirt. Russo testified that Mr. Bui's Hibernia bank card was found under a pillow on the bed where defendant had been lying.
Russo testified that after defendant was advised of his rights, he began telling him about his involvement in the carwash robbery. Defendant said the gun he used in the robbery was next door at the home of his friend, Walter. While the officers were at the Lowe residence, Walter Cosse knocked on the front door. The officers answered the door, and Cosse looked surprised. Cosse said he was there to visit defendant, and that he wanted to tell the officers something. Russo advised Cosse of his rights, and asked for his consent to search his residence. Cosse consented, and the officers searched his home. They recovered a .22 caliber gun from a clothes hamper in Cosse's bedroom.
Russo testified that he transported defendant to the JPSO's detective bureau, where he conducted three tape recorded interviews with defendant.[3] Defendant completed a waiver of rights form before each interview. The three tape recordings were played for the jury at trial. The recordings were transcribed, and the three transcripts were admitted in evidence as State's Exhibit 20.
The first recorded interview began at 6:50 p.m. on April 10, 2003. Both Russo and Sergeant Dyess questioned defendant about the carwash robbery.[4] Defendant said he was with Clarence, whose sister lives in his neighborhood. Clarence wanted to rob someone. Defendant said he was wearing a black shirt and black pants; and Clarence was wearing a white shirt pulled over his head, a "rag" (i.e., bandanna) over his face, jeans, and a jean jacket. Clarence's bandanna had a white or blue design in it. Clarence gave defendant a black knit hat with holes cut out for the eyes and nose. Clarence told defendant he had a gun.
Defendant stated that he and Clarence approached the carwash through the bushes in the back. Clarence, who was in front of defendant, approached an Asian man and demanded his wallet. Defendant grabbed the wallet and he and Clarence fled on foot. Defendant said Clarence ran behind him. Defendant got $10.00 in cash from the robbery. The wallet also contained a Hibernia bank card and some other cards.
Defendant told the detectives he went to Poochie's[5] house, and that Poochie drove him to various stores so they could use the victim's credit cards. They used Poochie's car, an old yellowish-colored Mercedes Benz. They went to the Quality Inn because it does not have a security camera at its ATM. They also went to Winn-Dixie, Wal-Mart, and Sav-A-Center. *1036 Poochie bought several bottles of alcohol at Albertson's, and defendant bought some baby items for his pregnant girlfriend. Defendant identified himself in still photographs taken from surveillance tape at Winn-Dixie and Wal-Mart. He also drew a diagram of the carwash robbery, a copy of which was attached to the transcript of the statement.
Defendant told the officers the ATM card they used was Mr. Bui's Hibernia card. He said they threw the cards away afterwards. He did not know how Mr. Bui's Hibernia card had gotten into his bedroom at the Lowes' apartment, because Poochie was the last one to have it. Defendant said he had given the gun to Walter to hold, and that it was now at Walter's house. The first interview ended at 7:21 p.m.
The second interview began at 8:32 p.m. on April 10, 2003. Detective Russo questioned defendant about the robbery of Michael Crawford in the apartment complex. Defendant said he was with "Putt," who lives in his neighborhood. They were walking around looking for someone to rob. Defendant was wearing a blue mask over his head with holes cut out of it for his eyes. Putt was wearing black pants and a black hooded sweater, and had a rag over his face. They saw the victim pull up in a vehicle, and they approached him. Defendant held the gun on the victim and told him to drop his wallet and run. The man complied. Defendant and Putt fled on a bicycle. He spotted a police car, and he got off of the bicycle, jumped over some fences, and went indoors.
Defendant said he used a black, .22 caliber revolver in the robbery. The victim's wallet was black. It contained several cards and $20.00 in cash. Defendant threw away the cards, and he and Putt each took $10.00. The second interview ended at 8:45 p.m.
Defendant's third interview began at 9:34 p.m. on April 10, 2003. Detective Russo showed defendant a photographic lineup. Defendant identified a photograph of the person he knew as Putt, the person with whom he committed the second robbery. Detective Russo noted for the record that the person defendant identified was Walter Cosse. Defendant said Cosse did not have a gun at the time of the robbery. The third interview ended at 9:37 p.m.
Aniquia Lowe testified on defendant's behalf at trial. At the time of the robberies, she was pregnant with defendant's child, and defendant was spending some nights at her mother's residence.[6] Aniquia testified that on April 8, 2003, the date of the robbery at the Quality Inn, she was taken to University Hospital in New Orleans after fainting. She was not discharged until 2:45 the following morning. Defendant was with her for at least part of her hospital stay. She was sleeping for part of that time, so she could not say what time he arrived at the hospital. Nor did she know whether he left the hospital and returned while she was sleeping. Aniquia testified that she and defendant were at her mother's house on April 10, 2003, when Detective Russo and Sergeant Dyess arrived. She said her mother was not at home at the time, and defendant was the oldest one there. Aniquia testified that her 14-year-old sister answered the door. The officers simply walked inside, went into the bedroom, and brought defendant out. Aniquia said the detectives had their guns drawn. They did not ask for her permission to search the residence.
Aniquia testified that Detective Russo asked her what the credit card was doing *1037 in the apartment, and she told him she did not know. Russo told her that if she did not tell them what defendant was up to, she would never see her unborn baby. Aniquia's mother and grandparents arrived at the apartment, and they spoke to the detectives. The officers took the defendant with them for questioning, and Aniquia did not see him again.
Shandrika Lowe, Aniquia's mother, testified she was at work on April 10, 2003, when the detectives arrived at her home. When she went home, she took her parents with her for support. When she got there, one of the detectives was outside the residence. She identified herself to him, and then entered the apartment. Sergeant Dyess explained to her what had happened, and asked for her permission to search the apartment. Ms. Lowe testified that Dyess told her she could either consent to a search or he would obtain a warrant and search the apartment anyway. Ms. Lowe said she could tell the apartment had already been searched. She nevertheless signed the consent form and allowed the detectives to search the residence.
Defendant took the stand in his own defense. He testified he was 17 years old at the time of his arrest, and 19 years old at the time of trial. Defendant denied having robbed Mr; Bui on April 1, 2003. He also denied any involvement in the robbery of Mr. Crawford on April 2, 2003. He testified that he did not rob the Quality Inn on April 8, 2003, and that he was at the hospital with Aniquia at that time.
Defendant said he came into possession of Mr. Bui's credit cards when Walter Cosse and Clarence Newsome visited him at Aniquia's house and bragged that they had robbed someone. They asked defendant if he wanted some credit cards, and defendant took them. Defendant then went to Wal-Mart with John Williams (a/k/a Poochie), and bought merchandise with the cards. Defendant said Patrick Wooten's testimony that he received credit cards from him was untrue.
Defendant identified himself in the surveillance photographs from the ATM at Winn-Dixie. He pointed out that John Williams was pictured attempting to use one of the victim's cards, while he (defendant) was talking on a telephone.
Defendant testified that when the detectives arrived at the Lowe residence, 14year-old Toniquia Lowe answered the door. The officers forced their way inside with their guns drawn. Defendant said the officers entered the bedroom where he was, shoved him against a wall, and held a gun to his head. The officers did not advise him of his rights in the apartment. The detectives told him they knew where the gun was, and they knew the answers to their questions already, so he should just give them the answers they wanted to hear. Sergeant Dyess told him if he did not cooperate, he would never see his baby.
Defendant testified that the officers questioned him all the way from the Lowe residence to the detective bureau. Once they arrived there, they questioned him for 15-20 minutes before they started recording. The detectives advised him of his rights at the detective bureau, but he did not understand what they told him. Defendant said the detectives told him what they wanted to hear, and he repeated it during the recorded interviews. The officers told him if he did not cooperate with them, he would receive a sentence of life imprisonment.
Defendant said that on the morning after his arrest, he went before a judge for a bond hearing. The judge advised him he had the right to remain silent. Afterwards, Detective Dyess got him from the parish correctional center and attempted *1038 to question him again. He told them he would not speak to them without his family present. The officers told him his family could not be present.
On the State's rebuttal, Sergeant Dyess testified that Aniquia Lowe answered the door when he and Russo arrived at her apartment. Aniquia gave them permission to enter the residence. He and Russo waited for 30-45 minutes for Shandrika Lowe to arrive. When Ms. Lowe completed the consent form, they began their search. Dyess further testified he never told defendant he was going to serve a life sentence for this series of robberies.
Detective Russo testified on rebuttal that he did not threaten Aniquia Lowe or defendant, nor did he tell defendant what answers to give during the recorded interviews. Russo further testified that Aniquia answered the door when he and Dyess arrived at her residence, and she did not mind if they entered. Russo said defendant cooperated with him and Dyess from the beginning.
DISCUSSION
By counsel's first assignment of error, defendant complains that the officers' entry and search of the Lowe residence was illegal, as it was not based on valid consent. He argues that any evidence seized as a result of the search should have been suppressed as fruit of the poisonous tree. The State responds that defendant failed to raise this argument below in his motion to suppress, and he is not entitled to raise it for the first time on appeal.
The defense has the burden of asserting the basis for its motion to suppress in order to provide the State with adequate notice so that it may prepare evidence addressing the defendant's claims. LSA-C.Cr.P. art. 703 E; State v. Jackson, 04-1388, p. 5 (La.App. 5 Cir. 5/31/05), 904 So.2d 907, 911, unit denied, 05-1740 (La.2/10/06), 924 So.2d 162. Therefore, the defendant is limited on appeal to the grounds articulated in his motion to suppress or at the hearing on that motion. A new basis, even a meritorious one, cannot be raised for the first time on appeal. State v. Jackson, supra; State v. Smith, 94-120, p. 6 (La.App. 5 Cir. 5/31/94), 638 So.2d 452, 455.
The record shows defendant was represented by appointed counsel for his arraignment and for some time thereafter. There is no evidence in the record that the public defender, Tracy Glorioso, filed any written suppression motions on his behalf. Nevertheless, the trial court heard defense motions to suppress evidence, confession, and identification on August 11, 2004. At the time of the suppression hearing, Ms. Glorioso was still representing defendant. The State's sole witness at the hearing was Detective Russo. Russo identified the consent form signed by Shandrika Lowe for the search of her residence. He testified Ms. Lowe freely and voluntarily consented to the search of the apartment.
In her argument to the court, defense counsel noted that defendant was only a guest in the Lowes' apartment, and that he did not consent to the search. She did not argue that the written consent of Ms. Lowe, the lessee of the residence, was invalid. The trial judge denied all of the suppression motions.
After the motion hearing, defendant retained James Williams as his trial counsel. Mr. Williams filed a Motion to Suppress the Evidence on September 17, 2004. Counsel asserted the evidence in this case was not seized pursuant to a lawful search, as the officers did not have a valid search warrant or probable cause. The motion contained no allegation that Ms. Lowe's consent for the search was invalid. Moreover, there is no evidence in the record *1039 that the written motion was ever heard. This Court has held that motions pending at commencement of trial are waived if the defendant proceeds to trial without objecting to the court's failure to rule. State v. Day, 00-64, p. 5 (La.App. 5 Cir. 5730/00), 762 So.2d 264, 268.
Based on the foregoing, we find the State is correct in its assertion that defendant is not entitled to review on this issue. Further, even if addressed on its merits, defendant's argument has no merit.
As a preliminary matter, it is noted that defendant has standing under the Fourth Amendment to challenge the officers' warrantless search of the Lowe residence, despite the fact that he was only a houseguest at the time of the search. In Minnesota v. Olson, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), the United States Supreme Court held that overnight guests have a legitimate expectation of privacy in their host's residence because the guest has a measure of control over the premises, and because "it is unlikely that [the host] will admit someone who wants to see or meet with the guest over the objection of the guest." Id., at 99, 110 S.Ct. at 1689.
Unless justified by one of the narrowly drawn exceptions to the Fourth Amendment's warrant requirement, a warrantless search is per se unreasonable. Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). In a hearing on a motion to suppress, the State bears the burden of proving that such an exception applies. LSC.Cr.P. art. 703 D; State v. Addison, 05-378, p. 8 (La.App. 5 Cir. 12/27/05), 920 So.2d 884, 890, writ denied, 06-1087 (La.11/9/06), 941 So.2d 36. The trial court's ruling on a motion to suppress is afforded great weight and will not be overturned unless it is clearly erroneous. State v. Cambre, 04-1317, p. 14 (La.App. 5 Cir. 4/26/05), 902 So.2d 473, 482, writ denied, 05-1325 (La.1/9/06), 918 So.2d 1039. To determine whether the trial court's denial of a motion to suppress is correct, the appellate court may consider the evidence adduced at the suppression hearing as well as the evidence presented at trial. State v. Addison, 05-378 at pp. 8-9, 920 So.2d at 890.
Consent to search is one of the recognized exceptions to the warrant requirement, where the consent is freely and voluntarily given by a person who possesses common authority over or other sufficient relationship to the premises or effects sought to be inspected. United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). A warrantless search may be valid even if consent was given by one without authority, if facts available to the officers at the time of the entry justified the officers' reasonable, albeit erroneous, belief that the one consenting to the search had authority over the premises. Illinois v. Rodriguez, 497 U.S. 177, 185-89, 110 S.Ct. 2793, 2799-2801, 111 L.Ed.2d 148 (1990); State v. Edwards, 97-1797, p. 11 (La.7/2/99), 750 So.2d 893, 901, cert. denied, 528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999). Consent may be oral or in writing. State v. Ossey, 446 So.2d 280, 287 (La.1984), cert. denied, 469 U.S. 916, 105 S.Ct. 293, 83 L.Ed.2d 228 (1984); State v. Gomez, 06-417, p. 7 (La.App. 5 Cir. 11/28/06), 947 So.2d 81, 86.
When the State relies on consent to justify a warrantless' search, it has the burden of proving the consent was freely and voluntarily given. State v. Enclade, 03-353, p. 9 (La.App. 5 Cir. 9/16/03), 858 So.2d 8, 15. Voluntariness of consent is a question of fact which the trial judge must determine based on a totality of the circumstances. Id. If consent to search is *1040 obtained after an illegal detention or entry, the consent is valid only if it was the product of free will and not the result of exploitation of the previous illegality. State v. Cambre, 04-1317 at p. 9, 902 So.2d at 480.
In the instant case, defendant maintains the officers did not enter the premises legally, basing his argument on defense testimony that the detectives entered the apartment uninvited, and with their guns drawn. The State's witnesses testified that the contrary was true. Detective Russo testified at trial that Aniquia Lowe answered the door and allowed him and Detective Dyess into the apartment. Dyess also testified that they had Aniquia's permission to enter the apartment. Russo testified that he and Dyess did not have their weapons drawn when they entered. Since Aniquia lived at the apartment, she possessed common authority over the premises. Aniquia's status as a minor did not vitiate her consent to the officers' entry. See State v. Brumfield, 05-2500, p. 6 (La.App. 1 Cir. 9/20/06), 944 So.2d 588, 594, n. 2, writ denied, 07-0213 (La.9/28/07), 964 So.2d 353, where the court found a minor resident of a trailer home freely gave an officer consent to enter to look for the defendant, whom the officer expected to find there. The Brumfield court found that the young man's status as a minor did not vitiate his consent.
In the instant case, defense witnesses testified that it was actually Aniquia's 14-year-old sister who answered the door when the detectives knocked. If that was the case, the sister's consent would have been sufficient to allow the officers to enter.
Defense witnesses testified that the officers searched the apartment before Shandrika Lowe arrived and signed the consent to search form. Detective Russo testified Aniquia gave them her verbal consent to look for defendant in the bedroom. Russo said that once they found defendant, they did not do anything else until Ms. Lowe arrived. The question of which witnesses' testimony was more truthful was a matter of credibility for the trier of fact.
The trial court did not err in finding, based on a totality of the circumstances, that Shandrika Lowe's written consent to a search of her apartment was freely and voluntarily given. The testimony at the suppression hearing was limited with regard to the consent form. The prosecutor simply had Detective Russo identify it, and asked whether Ms. Lowe signed it freely and voluntarily. Russo responded that she had. At trial, Russo testified that no one was forced or threatened to obtain their consent to the searches. Detective Dyess testified that the consent form Ms. Lowe signed contains a statement to the effect that the subject has the right not to consent to a search and to require police to obtain a warrant. He said Ms. Lowe cooperated with the officers. Ms. Lowe herself testified that her parents advised her to sign the consent form because she had nothing to hide, so she signed it.
Based on the foregoing, this assignment of error has no merit.
By counsel's second assignment of error, defendant complains that the statements he gave to police were inadmissible because they were the result of the officers' threats and coercion, and because he was questioned before he was advised of his Miranda rights.
Before a confession or inculpatory statement made under custodial interrogation can be admitted in evidence, the State' has the burden of showing that the accused who made the statement was first advised of his Miranda rights and that the statement was made freely and voluntarily, *1041 and not under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. LSA-R.S. 15:451; State v. Harris, 01-2730, p. 26 (La.1/19/05), 892 So.2d 1238, 1261, cert. denied, 546 U.S. 848, 126 S.Ct. 102, 163 L.Ed.2d 116 (2005); State v. Gurganus, 03-992, p. 11 (La.App. 5 Cir. 12/30/03), 864 So.2d 771, 778, writ denied, 04-0254 (La.6/4/04), 876 So.2d 75. A determination as to voluntariness is made on a case-by-case basis, with a regard for the facts and circumstances of each case. Id. The critical factor in a knowing and intelligent waiver is whether the defendant was able to understand the rights explained to him and voluntarily gave the statement. State v. Pugh, 02-171, p. 19 (La.App. 5 Cir. 10/16/02), 831 So.2d 341, 353. The trial judge's determination as to the admissibility of the statement is entitled to great weight and will not be overturned unless unsupported by the evidence. State v. Gregory, 05-628, p. 8 (La.App. 5 Cir. 3/28/06), 927 So.2d 479, 483.
At the suppression hearing, Detective Russo identified the two rights of arrestee forms completed by defendant on April 10, 2003, and a third that was completed on April 15, 2003. Russo testified that he advised defendant of his rights, and defendant did not have any questions. Defendant initialed the form beside each right to indicate that he understood what was explained to him. He also signed the forms to indicate he understood his rights and he was willing to waive his rights and answer the officers' questions without an attorney present.
Detective Russo testified that defendant did not invoke his right to an attorney at any time. He did not appear to be under the influence of alcohol or drugs, nor did he appear to suffer any mental defects. Russo testified no one threatened or coerced defendant in order to induce him to submit to the interviews. No intimidating tactics were used on defendant.
At trial defendant testified that Russo and Dyess questioned him on the trip from the Lowe residence to the detective bureau without first advising him of his rights. Defendant also stated that Sergeant Dyess told him if he did not cooperate with the investigation he would never see his unborn baby. Dyess also told him he would go to prison for life if he did not cooperate. According to defendant, the officers told him what to say during the recorded interviews. He admitted to the robberies because they held a gun to his head.
Defendant testified the officers allowed him to use the telephone in his office to make a call between the first and second interviews. He called a girlfriend, Marcia Vaughn. When he told Marcia the officers were threatening him, Sergeant Dyess took the telephone from him and hung it up. Marcia testified at trial that defendant did telephone her following his arrest on April 10, 2003. He told her he was in jail, and she did not believe him. She heard some noise on the line, and then the call was disconnected.
Defendant further testified at trial that on April 15, 2003, after he had been before a judge arid had his bond set, Sergeant Dyess took him from the correctional center and told him he was "going for a ride." Defendant told Dyess the only way he would talk to him again was if his family was allowed to be there. Dyess told him he could not have his family there. The officer questioned him for several hours before returning him to the jail.
Detective Russo testified at trial that defendant was advised of his Miranda rights at the Lowe residence. Russo said that, either he or Sergeant Dyess was with defendant at all times at the detective bureau following his arrest on April 10, *1042 2003. Defendant never asked to make a telephone call `while there. If defendant had made a call, he or Dyess would have witnessed it. Russo said if Marcia Vaughn claimed defendant telephoned her to inform her that officers were abusing him, she was lying. Russo further testified that he never turned off the tape recorder during the first interview on April 10, 2003.
Russo testified that when he interviews suspects, he does not suggest to them what answers they should give. There were time lapses between the statements because each statement pertained to a different robbery case, and he stopped after each one to do paperwork pertaining to that individual case.
Sergeant Dyess testified that on April 15, 2003, he again advised defendant of his rights, and completed an advice of rights form with him. According to Dyess, defendant said he understood his rights, and he wanted to waive them and give a statement. Dyess questioned defendant about the Quality Inn robbery. Defendant denied any involvement in that robbery, and said he only went into the hotel to use the telephone. At that time defendant refused to submit to a recorded interview. Dyess testified he concluded the questioning, because once a subject says he wants to discontinue an interview, police cannot, by law, force him to continue.
During the State's rebuttal case, Sergeant Dyess testified that he did not tell defendant he would serve a life sentence for this series of robberies. Detective Russo testified he did not see Sergeant Dyess hold a gun to defendant's head, nor did he hear Dyess threaten defendant. Russo further testified that he did not feed defendant information during the three recorded interviews. Russo said defendant cooperated with the investigation from the beginning.
Before the officers began the recorded interviews on April 10, 2003, they questioned defendant about whether he had been advised of his rights, and whether he was freely and voluntarily waiving them. Defendant acknowledged that the officers had verbally advised him of his rights before transporting him to the police station. He further stated that the officers had gone over the waiver of rights form with him, and that he had initialed and signed it. Defendant said he understood all of his rights, and that he wished to waive them and submit to an interview. At the conclusion of the first statement defendant said he had not been forced to give the officers information.
At the beginning of the second recorded statement, defendant acknowledged that he had been advised of his rights again, and that he had signed the second waiver of rights form. Defendant stated he had not been forced in any way to make a statement. At the beginning of the third recorded statement, defendant again acknowledged that he had been advised of his rights, and that he had not been forced to submit to the interview.
Where the State's and the defendant's testimony differ, the trial judge and the jury apparently found the State's witnesses to be the more credible. Based on the foregoing, we find the State sufficiently proved that defendant was properly advised of his rights, and that he knowingly and voluntarily waived his rights prior to making statements to police. There is no evidence that the trial court erred in denying defendant's motion to suppress statements. This assignment of error is without merit.
In a pro se assignment of error, defendant argues he was prejudiced by the prosecutor's attempts to question him about prior arrests during cross-examination at' trial.
*1043 Defendant refers to an exchange in which the prosecutor questioned him about the circumstances surrounding his recorded statements to police. Defendant commented that he had "never been in trouble before, to understand the rights of the law." The following colloquy ensued:
Q. Let's focus on that for a second. You've never been in trouble before?
A. No, ma'am.
Q. Ever?
A. No, ma'am.
Q. You've never been arrested before and had your rights read to you, previously,  prior to this?
A. Runnin' away from home, but how could you call that arrested, when I was released to my mother custody.
Q. And you've never been arrested for anything else, where you've had your rights read to you?
A. No.
Q. Are you sure about that?
A. Yes.
Q. You weren't arrested for 
At that point, defense counsel objected. Out of the jury's presence, counsel stated that if the prosecutor asked one more question about prior arrests, he would move for a mistrial. The prosecutor countered that during direct examination, the defense had "opened the door" to questioning on the subject of arrests. The trial judge asked the prosecutor whether she had any proof that defendant had ever been advised of his rights in the past. The prosecutor said she did not. The judge said, "Well, I'm going to sustain his objection, because if you don't have any proof that he was advised, I mean, you're going to go into a bunch of arrests, I don't think that's going to be proper." The State's cross-examination then continued without further mention of arrests. Defendant now argues the trial court erred in failing to grant a mistrial based on the State's improper questioning.
Every testifying witness in a criminal case, including the defendant, subjects himself to limited examination relative to his criminal convictions. LSA-C.E. art. 609.1 A. Generally, evidence of arrests not resulting in convictions is not admissible on the issue of credibility. LSA-C.E. art. 609.1 B; State v. Johnson, 94-1379, pp. 10-11 (La.11/27/95), 664 So.2d 94, 99; State v. Burks, 04-1435, p. 13 (La.App. 5 Cir. 5/31/05), 905 So.2d 394, 402, writ denied, 05-1696 (La.2/3/06), 922 So.2d 1176.
LSA-C.Cr.P. art. 770 provides, in part, that a mistrial shall be ordered when the district attorney makes a remark or comment within the hearing of the jury referring directly or indirectly to "[a]nother crime committed or alleged to have been committed by the defendant as to which evidence is not admissible[:]" Defendant argues the trial court erred in failing to grant a mistrial. But the record shows counsel never moved for a mistrial; he only threatened to do so.
In any case, the prosecutor's line of questioning did not constitute reversible error. There was no specific mention of any prior offenses for which defendant Was arrested, and defendant denied having a history of previous arrests. Any error committed by the trial court was harmless.
Defendant also complains that the jury was inflamed by the prosecutor's assertion during closing rebuttal argument that he is a "serial robber." Defendant argues that the prosecutor's comment prejudiced the jury, and that the judge should have admonished the jurors to disregard it.
Defendant refers to the following portion of the prosecutor's argument:
*1044 The reason  the reason that Mr. Veals talked to the police that night is because, in his mind, for whatever reason, these are his accomplishments. This is what he was doing for a living. He was out there being a man, and he thinks he's out there and he's supporting his family and he's doing a good job by them. And so when he's talking to the police, the reason he's yawning and laughing and relaxing is because he  these are his accomplishments. He's proud of himself. And I think that's evidenced in those statements.
And he may think that God has forgiven him but the citizens of Jefferson Parish have to worry about our safety. Mr. Veals is a serial armed robber, like I said in my first closing, and he should not be allowed out on the streets because he's not sorry for what he did and he did it, he did all three of them. He was involved in the first one, in the second one and the third one. It was his job; it was his profession. He doesn't have another one.
Defendant did not preserve this issue for appeal, since he did not object at trial to the prosecutor's remarks. LSC.Cr.P. art. 841. In any case, defendant's argument has no merit.
In State v. Frank, 99-0553, p. 30 (La.5/22/07), 957 So.2d 724, 743 (citations omitted), the Louisiana Supreme Court explained:
[T]his court will not reverse a conviction or sentence on the ground of improper closing argument unless it is thoroughly convinced that the remarks influenced the jury and contributed to the verdict. Giving deference to the good sensibility and fairmindedness of juries . . . and after reviewing the argument as a whole and the limited nature of the prosecutor's objectionable comments therein, we can conclude that the comments did not influence the jury or contribute to the death sentence.
In this case defendant was charged with three instances of armed robbery, each on a different day against a different victim. In calling defendant a serial armed robber, the prosecutor was merely referring to the evidence presented at trial. Giving deference to the good sensibility and fairmindedness of juries, and viewing the comment in the context of the prosecutor's entire argument, we fail to find that the comment prejudiced the jury or contributed to the verdict.
Based on the foregoing, this assignment of error is without merit.
ERRORS PATENT DISCUSSION
Defendant requests an error patent review. This Court routinely reviews the record for errors patent in accordance with LSA-C.Cr.P. art. 920 regardless of whether defendant makes such a request. See State v. Oliveaux, 312 So.2d 337 (La. 1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The following matter was discovered:
At the time of sentencing, the trial court advised defendant, "You have two years to file for post conviction relief." The trial court's advisal was incomplete, since LSC.Cr.P. art. 930.8 A provides that a defendant has two years "after the judgment of conviction and sentence has become final" in which to file an application for postconviction relief.[7] We therefore remand the case to the trial court with instructions that it provide defendant with written notice of the provisions of Article 930.8, and *1045 to file written proof of said notice in the record. State v. Taylor, 04-90, p. 15 (La. App. 5 Cir. 5/26/04), 875 So.2d 962, writ denied, 04-1649 (La.11/19/04), 888 So.2d 193.
DECREE
Accordingly, for the reasons assigned herein, defendant's conviction and sentence are affirmed. In addition, the case is remanded to the trial court to correctly inform defendant in writing of the prescriptive period contained in La. C.C.P. art. 930.8 and to file written proof of the notice in the record.
AFFIRMED; CASE REMANDED WITH INSTRUCTIONS.
NOTES
[1] This appeal pertains only to Patrick Veals.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] Detective Russo explained that he conducted a separate, interview for each armed robbery incident.
[4] Detective Dyess only participated in the first interview.
[5] Although defendant did not know Poochie's real name at the time of the interview, it was established at trial that his name was John Williams.
[6] Aniquia's mother, Shandrika Lowe, testified that Aniquia was 16 years old in April, 2003.
[7] The commitment reflects that the trial court properly advised defendant of the prescriptive period under Article 930.8. But where the transcript and the minute entry conflict, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983).