MARION F. EDWARDS, Judge.
 

 12Pefendant/appellant, Phillip Knight, appeals his conviction of the second degree murder of his father, Bobby Knight, and the life sentence imposed as a result of that conviction. We affirm both the conviction and the sentence.
 

 Knight was charged with the murder that occurred on October 26, 2000. He pled not guilty at the arraignment. On December 5, 2000, Knight withdrew his plea of not guilty and entered a plea of not guilty by reason of insanity. Knight also filed a motion to appoint a sanity commission to determine his competency to stand trial. The trial court appointed the Jefferson Parish Human Services Authority to examine Knight and to report on his mental condition and his competency to stand trial. The trial court held a competency hearing on February 1, 2001, and found Knight competent to stand trial.
 

 | .¡On August 24, 2001, the trial court heard and denied Knight’s motion to suppress evidence. A jury trial began on May 7, 2002. Following jury selection, defense counsel challenged Knight’s competency to proceed. After hearing medical testimony on the matter, the trial court declared a mistrial and ordered that Knight be placed in the Feliciana Forensic Facility for a complete psychological evaluation. The trial court held another competency hearing on October 22, 2003, and found Knight competent to stand trial.
 

 Knight’s case proceeded to trial a second time on August 19, 2004, at which time he withdrew his plea of not guilty and not guilty by reason of insanity. On the following day, out of the jury’s presence, defense counsel moved for a mistrial. Counsel argued that Knight was a diag
 
 *311
 
 nosed paranoid schizophrenic, that he did not understand the proceedings, and that he was unable to assist in his defense. The trial court declared a mistrial and ordered that the prison’s medical staff monitor Knight’s medication.
 

 The trial court held another competency hearing on October 20, 2004, and found that Knight was not competent to proceed to trial. The court held another competency hearing on April 20, 2005. This time, the trial court found Knight was competent to stand trial. Knight again entered a plea of not guilty and not guilty by reason of insanity. On March 21, 2007, following another competency hearing, the trial court again found Knight was incompetent to stand trial. On October 31, 2007, the court held another competency hearing, and found Knight competent to proceed to trial.
 

 On June 30, 2008, Knight again withdrew his plea of not guilty and not guilty by reason of insanity, and entered a plea of not guilty. After a jury trial, Knight was found guilty as charged. In due course, the trial court imposed a |4mandatory life sentence at hard labor without benefit of parole, probation, or suspension of sentence. Knight moved for and was granted an appeal.
 

 FACTS
 

 Herman Duchman, Jr., a real estate developer, purchased a house at 2221 Claire Avenue on August 31, 2000. He inspected the interior of the house that day, and found it to be satisfactory. He locked up the house when he left. Mr. Duchman returned to the house the following morning at about 8:00 in order to start cleaning it. He found his key would not work in the door lock. It looked as if someone had tried to kick in the door and/or “jimmy” the lock. Mr. Duchman decided to stay outside and start cleaning up the yard. When he picked up a large branch lying beside the porch, he discovered a suspiciously shaped bundle under it. The bundle consisted of a blanket and garbage bags wrapped around something with a human-like shape. It was bound by a lightweight extension cord. Mr. Duchman called police from a neighbor’s telephone to report the suspect package.
 

 Detective Ronald Still, who at that time was a general assignment detective with the Gretna Police Department, arrived at 2221 Claire Avenue at about 9:30 a.m. on September 1, 2000. The scene had already been cordoned off by other officers. Detective Still testified he saw a bundle consisting of a blue comforter and trash bags wrapped around something he later learned was a body. An extension cord and some black nylon rope were tied around the outside of the package. A human foot was sticking out of the bundle.
 

 Residents in the area expressed concern that an elderly man, named Bobby Knight, normally sat outside of his residence in the mornings, but he had not been seen that morning. They were worried that the body discovered next to the vacant house might be Mr. Knight’s body. Based on the information he had gathered, Detective Still went to the residence at 2303 Claire Avenue to check on Mr. |5Knight. The door to the house was unlocked, and there were no signs of forced entry or burglary. Detective Still went inside, and, in the front room, he saw trash bags and some black nylon rope similar to those wrapped around the abandoned body. In one bedroom, the officer found a bare mattress with what appeared to be blood stains.
 

 Detective Still testified that he had officers secure Mr. Knight’s house while he applied for a search warrant. Once he obtained the search warrant, he returned to the house. Detectives Russell Lloyd and Wayne Lawrence executed the search of the residence.
 

 
 *312
 
 Detective Still interviewed Roderick Bristo, one of the concerned neighbors, and, based on what he learned, obtained an arrest warrant for Bobby Knight’s son, Phillip Knight, who lived with his father. He later received word that Phillip Knight had been apprehended in the “Mary Poppins” area. Phillip Knight was brought to Detective Still’s office, and the officer advised him of his Miranda
 
 [1]
 
 rights. Detective Still testified that Phillip Knight did not seem at all surprised when he was told he was under arrest for his father’s murder. However, he told officers that he did not kill his father.
 

 Roderick Bristo testified that, in September 2000, he was homeless and was sleeping at night in the carport of a friend, Rosie Valentine, at 2312 Claire Avenue in Gretna. At that time, Phillip Knight lived with his father, Bobby Knight, at 2303 Claire Avenue. Mr. Bristo described Bobby Knight as an odd-looking man who could barely walk, even with the assistance of a cane. Mr. Bristo was very friendly with Mr. Knight, who spent most of his days sitting in his house or on his front porch.
 

 | (¡Mr. Bristo testified that the relationship between Bobby Knight and his son, Phillip, was strained. Mr. Bristo heard Phillip and Bobby arguing about money on four or five occasions during the six months prior to September 2000. One night, Mr. Bristo encountered Phillip and Bobby standing on the corner of Claire Avenue and 23rd Street, arguing about money. Phillip hit Bobby, knocking the older man’s cane out from under him and causing him to fall on the ground. Mr. Bristo testified that, about two months prior to September 2000, Phillip told Mr. Bristo he was going to get money from Bobby’s life insurance policy and that he was going to get Bobby’s Social Security benefits “in the wrong way.”
 

 During the night of August 31, 2000 and the early morning hours of September 1, 2000, Mr. Bristo was waiting outside of 2312 Claire Avenue for his ex-wife to bring him some beer and cigarettes. He expected her to arrive sometime after midnight, when she got off work. While he was waiting, he saw Phillip come out of the back door of Mr. Knight’s house carrying something on his shoulder. Phillip put the bundle on the ground and dragged it across the street to a vacant house on Claire Avenue. He laid the object on the ground and tried, unsuccessfully, to kick in the door of the house. Phillip then attempted to shove the object under the house, but it was too big to fit there. He covered the object with twigs and other debris, and then he returned to Mr. Knight’s house. Mr. Bristo testified that he saw all of this from a distance of about 25 feet. Phillip did not appear to notice him.
 

 About ten minutes later, Phillip exited Mr. Knight’s house again. He saw Mr. Bristo and walked over to him. Mr. Bristo testified there was nothing unusual about Phillip’s demeanor. Phillip asked for a cigarette, and Mr. Bristo replied that he did not have any. Mr. Bristo asked Phillip what he was doing at the vacant [7house, and Phillip said he was just looking around. Phillip then went back to the Knight residence.
 

 Mr. Bristo testified that he did not go to the vacant house to investigate because he did not want to be caught trespassing. His ex-wife did not show up as promised, and he went to sleep at about 1:30 a.m. He woke up at about 5:00 a.m., and saw Phillip carrying a box of clothes in the direction of a nearby canal. Phillip returned without
 
 *313
 
 the box and went back inside Mr. Knight’s house. Then he left the house again between 6:00 and 6:30 a.m. and went back toward the canal. He returned to Mr. Knight’s house carrying the box. Phillip left the house again, and Mr. Bristo decided to follow him. He saw Phillip go across the canal to an apartment complex commonly known as “Mary Poppins.”
 

 Following his arrest, Phillip Knight’s clothing was seized. Among the items of clothing was a pair of blue jeans. Detective Still explained that spots on the jeans that appeared to be blood were cut out for analysis. Detective Still obtained a search warrant for a sample of Phillip Knight’s blood.
 

 Detective Wayne Lawrence was the crime scene technician who assisted in executing the search warrant at the Knight residence. He testified that he videotaped the inside of the residence as he walked through it. The videotape was played for the jury. He collected several items of evidence from the scene, including pieces of the mattress from the first bedroom, a piece of blood-stained carpet, a piece of black rope, some plastic garbage bags, and two kitchen knives.
 

 Detective Lawrence also collected evidence at Mr. Knight’s autopsy, including the items in which the body was wrapped, the victim’s clothing, and a vial of the victim’s blood. Detective Lawrence took custody of the clothing seized from Phillip Knight, and the vial of his blood taken pursuant to a search warrant. The detective took the blood to the crime lab for processing. Detective Lawrence |stook several photographs at the scene, including some that depicted what appeared to be drag marks on the ground outside of the home.
 

 Detective Russell Lloyd testified that he assisted in executing the search warrant at the Knight residence. He received information that the murder weapon might have been discarded in a canal located about one-half block from the victim’s house. He and other officers put on boots and went into the canal to search for a weapon, but they did not find anything of evidentiary value.
 

 Detective Still identified an exhibit presented by the State as a photograph of writing found on the wall in Phillip Knight’s bedroom. The writing included the statement “Bobb 6 Knight dies becaus [sic] he is the devil....”
 
 [2]
 

 Pamela Williams, an expert in serology, testified she works at the Jefferson Parish Crime Lab screening evidence for biological fluids such as blood, saliva, and urine. She tested numerous pieces of evidence in this case. Of the items she examined, she detected the presence of blood on the comforter and sheet the victim was wrapped in, the black garbage bag removed from the victim’s body, the pants and T-shirt the victim wore, pieces of a mattress, a piece of carpet, and Phillip’s blue jeans. She noted there was no blood detected on the knives seized in this case. Ms. Williams testified she sent some pieces of Phillip Knight’s blue jeans that tested positive for the presence of human blood for DNA (deoxyribonucleic acid) testing at the Jefferson Parish DNA lab. Ms. Williams’ report was admitted as evidence.
 

 Bonnie Dubourg, an expert in molecular biology and forensic DNA analysis, testified she is employed by the Jefferson Parish Sheriffs Office and is assigned to the DNA lab at the Jefferson Parish Forensic Center. She is a forensic DNA | ¡,analyst.
 
 *314
 
 Ms. Dubourg received reference blood samples of both Phillip and Bobby Knight. She also received fingernail scrapings and nail clippings from both men and cuttings from the legs of Phillip’s blue jeans. Ms. Dubourg determined that Bobby Knight’s fingernail scrapings were consistent with his reference blood sample, and there were no additional DNA donors in those scrapings. She found that Phillip Knight’s fingernail scrapings were consistent with his reference blood sample, but there was not enough DNA in the sample for her to do further testing on those scrapings.
 

 DNA test results for the cutting from the left leg of Phillip’s jeans were consistent with a mixture of blood from both Bobby and Phillip Knight. Ms. Dubourg testified that neither Phillip nor Bobby Knight could be excluded as donors as to that cutting. The DNA test results for the cutting of the right leg of Phillip’s jeans were also consistent with a mixture of the victim’s and defendant’s blood.
 

 Dr. Susan Garcia, an expert in forensic pathology, testified she is an assistant coroner with the Jefferson Parish Forensic Center. She performed an autopsy on the body of the victim, Bobby Knight. Dr. Garcia testified that Mr. Knight had five stab wounds and evidence of blunt trauma to the face. His jaw was fractured, and his eye was swollen and bruised. There was scleral hemorrhaging, i.e., bleeding into the whites of the eyes that is often associated with manual or ligature strangulation. The doctor did not note any defensive wounds on the victim’s body.
 

 Dr. Garcia testified that lividity fixes about twelve to twenty-four hours after death. In this case, the lividity was not fixed at the time she examined the body. The doctor further explained that rigor mortis is usually apparent in four to twelve hours after death and can fix between twelve and twenty-four hours. Dr. Garcia | ^estimated the victim died between twelve and twenty-four hours before her office was notified.
 

 The doctor determined the cause of death in this case to be multiple stab wounds. The manner of death was homicide, and Bobby Knight bled to death.
 

 LAW AND ANALYSIS
 

 SUFFICIENCY OF EVIDENCE
 

 Defense counsel has presented three errors for our review. In addition, Phillip Knight has filed a
 
 pro se
 
 brief with this Court in which he assigns two errors. Because one of the counseled errors is insufficient evidence to support the conviction, that issue will be discussed first. When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence.
 
 [3]
 
 If the reviewing court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors in necessaiy. Alternatively, when the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the defendant is not entitled to an acquittal, and the reviewing court must consider the assignments of trial error to determine whether the accused is entitled to a new trial.
 
 [4]
 

 Knight maintains the evidence at trial was insufficient to identify him as the murderer or to prove he had the specific intent to kill or inflict great bodily harm. He argues there was no eyewitness to the offense; and Roderick Bristo, the State’s
 
 *315
 
 central witness, was an unreliable alcoholic and a convicted burglar. The State responds that the evidence at trial overwhelmingly pointed to defendant’s guilt.
 

 The constitutional standard for testing the sufficiency of the evidence requires that a conviction be based on proof sufficient for any rational trier-of-fact, |nviewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt.
 
 [5]
 
 The rule as to circumstantial evidence is “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.”
 
 [6]
 

 The Louisiana Supreme Court has explained its standard of review where the State relies on circumstantial evidence to prove its case:
 

 In circumstantial evidence cases, this court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events. Rather, this court, evaluating the evidence in the light most favorable to the prosecution, determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt.
 
 [7]
 

 Ultimately, all evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt.
 
 [8]
 

 Second degree murder is defined as the killing of a human being when the offender has specific intent to kill or to inflict great bodily harm, or is engaged in the perpetration or attempted perpetration of one of several enumerated felonies even though he has no intent to kill or to inflict great bodily harm.
 
 [9]
 
 In addition to proving the statutory elements of the charged offense at trial, the State is required to prove the defendant’s identity as the perpetrator.
 
 [10]
 
 As a general matter, when the key issue is the defendant’s identity as the perpetrator, rather than whether the 112crime was committed, the State is required to negate any reasonable probability of misidentification.
 
 [11]
 

 As Phillip Knight points out, there was no direct evidence at trial that he killed Bobby Knight. But there was strong cir
 
 *316
 
 cumstantial evidence to support the conviction. DNA testing showed that blood on Phillip’s blue jeans was consistent with the victim’s blood. Also, the evidence showed that the plastic garbage bags and cords used to wrap the victim’s body were consistent with bags and cords found in the house the victim shared with his son.
 

 Mr. Bristo testified that he witnessed Phillip’s attempts to hide the body. Mr. Bristo stated that he saw Phillip drag a large object from the victim’s house to the vacant house across the street. Mr. Bris-to’s description was consistent with Detective Wayne Lawrence’s testimony that there appeared to be drag marks on the ground outside of the victim’s home. Mr. Bristo further testified that Phillip attempted to kick in the door of the vacant house. That testimony was consistent with that of the home’s new owner, Mr. Duchman, who arrived there on the morning of September 1, 2000, to find that someone had tried to break into the house.
 

 Defendant characterizes Mr. Bristo as an alcoholic, but there is nothing in the evidence at trial to support that assertion. Mr. Bristo did testify he was waiting for his ex-wife to bring him beer on the night of the incident, but he also testified that she never arrived with those items. There was nothing in the evidence at trial that showed Mr. Bristo drank alcohol on the night of August 31, 2000, or the early morning of September 1, 2000.
 

 11sMr. Bristo testified he was convicted of burglary in 1983 and shoplifting in 1999. However, the jury seemingly did not find that the witness’s criminal record rendered his testimony unreliable.
 

 The appellate court is required to consider the whole record and determine whether a rational trier-of-fact could have found the defendant guilty beyond a reasonable doubt.
 
 [12]
 
 It is not the function of the appellate court to re-evaluate the credibility of witnesses, reweigh the evidence, or to overturn the factual determination of guilt.
 
 [13]
 
 Absent internal contradiction or irreconcilable conflict with the physical evidence, a single witness’s testimony, if believed by the fact finder, is sufficient to support a factual conclusion.
 
 [14]
 

 In the instant case, the State proceeded under the “specific intent” theory of second degree murder. Specific intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.”
 
 [15]
 
 Specific intent need not be proven as a fact, but may be inferred from the circumstances surrounding the offense and the conduct of the defendant.
 
 [16]
 
 Whether a defendant possessed the requisite intent in a criminal case is a question for the trier-of-fact, and a review of the correctness of this determination is guided by the Jackson standard.
 
 [17]
 

 Given the evidence produced at trial, the jury could have reasonably inferred Phillip Knight had specific intent to kill or inflict great bodily harm. Dr. Gar
 
 *317
 
 cia testified that the victim in this case sustained five stab wounds and that the two “lethal” wounds went six to seven inches into the victim’s chest cavity. The doctor 114determined that the victim bled to death. Specific intent to kill can be inferred from the intentional use of a deadly weapon such as a knife or a gun.
 
 [18]
 
 There were also indications that the victim had been strangled.
 

 Also indicative of specific intent was the portion of the writing on the wall in the victim’s house that read, “Bobb 6 Knight dies becaus [sic] he is the devil....” Knight does not suggest that anyone else lived in that room. Rather, in his brief, Knight conceded the back bedroom of the residence where the writing was found on the wall was considered his.
 

 Also significant was Mr. Bristo’s testimony that he had seen Phillip Knight hit his father in the past and that he had heard Knight argue with the victim on four or five occasions in the six months leading up to the murder.
 

 Knight argues the State failed to produce a murder weapon or the box of clothing Mr. Bristo saw Knight carrying on the morning of September 1, 2000. Detective Russell Lloyd testified he and other officers searched a canal near the murder scene, and they did not find anything of evidentiary value. Given the testimony, it was possible for the jury to infer that Knight disposed of the murder weapon somewhere other than the canal, or that he threw it into the canal and the officers simply failed to locate it. In any case, there is nothing in the second degree murder statute that requires the State to produce the murder weapon in order to meet its burden of proof at trial.
 

 Based on the foregoing, we find that a rational trier-of-fact could have found Phillip Knight guilty beyond a reasonable doubt. This assignment of error lacks merit.
 

 |
 
 ^ADMISSION of photograph
 

 Knight maintains the trial court erred in admitting the photograph that depicts writing on a wall in the house he shared with his father. He argues officers took the photograph sometime after they executed the search warrant and that they entered the house without a warrant or valid consent. In his supplemental brief, Knight argues that it was error for the trial court to admit the photograph when the State did not offer any evidence to show the handwriting on the wall was his.
 

 The State responds that the search was valid because the police officers obtained consent from the victim’s brother, David Phillips, and from the landlord. The State further argues that if the trial court erred in admitting the evidence, the error was harmless.
 

 A warrantless search is per se unreasonable unless justified by one of the narrowly drawn exceptions to the Fourth Amendment’s warrant requirement.
 
 [19]
 
 If evidence is derived from an unreasonable search or seizure, the proper remedy is to exclude the evidence from trial.
 
 [20]
 
 In a hearing on a motion to suppress, the State bears the burden of proving that such an exception applies.
 
 [21]
 

 
 *318
 
 Trial courts are vested with great discretion in ruling on a motion to suppress, and, consequently, the ruling of a trial judge on a motion to suppress will not be disturbed absent an abuse of that discretion.
 
 [22]
 
 To determine whether the trial court’s denial of a motion to suppress is correct, the appellate court may consider the evidence adduced at the suppression hearing as well as the evidence presented at trial.
 
 [23]
 

 Imln arguing this assignment of error, both Knight and the State refer to facts found in a supplemental police report dated September 15, 2000. The parties do not include record citations for the report in their briefs. Although the report is included in the appeal record among documents the State turned over to the defense in pre-trial discovery, it was not entered into evidence at either the hearing on Knight’s motion to suppress evidence or at trial. Thus, the trial court did not consider it in ruling on the admissibility of the photograph. Since this Court may only consider the evidence introduced at the suppression hearing and at trial in reviewing the trial court’s ruling, the contents of the police report are not before us. Thus, any references to that report will not be considered by this Court.
 

 At the suppression hearing in this case, Detective Russell Lloyd testified he reported to the Claire Avenue scene after the victim’s body was discovered. He learned that several neighbors had expressed concern about Bobby Knight, since he usually sat in front of his house, and no one had seen him that morning. Detective Lloyd approached Mr. Knight’s house and shouted, but he got no response. He then knocked on the front door, and the door swung open. Detective Lloyd saw plastic bags lying on the floor inside the house. Another officer pointed out some black nylon rope that looked like the rope that was used to tie up the body that had been found. Detective Lloyd thought there might be someone inside the house who was injured or dead. He notified Detective Still, who then entered the house by himself.
 

 Detective Still testified at the motion hearing that he entered the Knight residence sometime between 9:05 and 10:00 a.m., although he did not obtain the warrant to search the house until 11:00 or 11:30 a.m. He initially entered the home without a warrant because Mr. Knight’s neighbors were concerned about his well-being. Detective Still testified he was in the house for about five minutes. He 117went inside through the front door and walked through the house. Seeing there was no one inside, he turned around and exited the way he had entered.
 

 Detective Still testified the Knight residence was videotaped during the execution of the search warrant. Some days after the search warrant was executed, Detective Still returned to the house to take photographs of a wall in one of the bedrooms. On the wall was written, “I love Ginger. Bobby Knight must die.”
 
 [24]
 
 Detective Still testified that the words appeared to have been written with a marker, and that one of the letters was drawn to look like a devil’s pitchfork. Before entering the house this time, Detective Still obtained permission of the property
 
 *319
 
 owner, Mr. Knight’s landlord. The owner informed the detective that he had rented the residence to Bobby Knight, and that Mr. Knight was not current in his rent payment at the time of his death. The attorneys briefly argued the matter, and the trial judge denied the motion to suppress without reasons.
 

 The photograph at issue here was introduced at trial during Detective Still’s testimony. Defense counsel objected to its admission, arguing:
 

 ‘Tour Honor, the last photo that was shown, published to the jury, I’m going to object to that photo because, although it was Bobby Knight’s bedroom, we don’t know if anyone else ever lived in that bedroom right before this incident, within a year before this incident. And we don’t have any kind of handwriting samples. I just don’t — I don’t believe— I think it’s more prejudicial to my client than it is, you know, beneficial to the State to prove its case.”
 

 The State responded that the probative value of the photograph outweighed any prejudicial effect it would have. The State further argued that defense counsel’s objection went to the weight of the evidence rather than its admissibility. The trial court overruled defendant’s objection and allowed the photograph to be admitted.
 

 118One of the recognized exceptions to the warrant requirement is a search based on consent.
 
 [25]
 
 Consent to search is valid when it is freely and voluntarily given by the defendant or by a person who possesses “common authority over or other sufficient relationship to the premises or effects sought to be inspected.”
 
 [26]
 
 The State bears the burden of proving there was valid consent.
 
 [27]
 

 In order to show that a third party had actual authority to consent to a search, the State must show “mutual use of the property by persons generally having joint access or control for most purposes.”
 
 [28]
 
 The Fourth Amendment does not permit a landlord to consent to a search in an area leased exclusively to a tenant.
 
 [29]
 
 But a search consented to by a third party without actual authority over the premises is nonetheless valid if the officers could reasonably, albeit erroneously, conclude from the available facts that the third party had apparent authority to consent to the search.
 
 [30]
 

 In
 
 United States v.
 
 Green,
 
 [31]
 
 defendant Kenneth Green and co-defendants Campbell and Lynce were arrested after federal agents seized 116 pounds of marijuana from Green’s nightclub. Agents later learned from a confidential informant that additional contraband could be found at Campbell’s apartment. Following the arrests, the officers obtained a search warrant for Campbell’s apartment. When they arrived to execute the warrant,
 
 *320
 
 Campbell’s girlfriend told them that, prior to their arrival, several people had moved a number of items from Campbell’s apartment to an allegedly vacant apartment above.
 
 [32]
 
 The manager of the apartment building told the officers that the upstairs apartment had previously | |9been rented to Robert Green, Kenneth Green’s brother, but that Robert had moved out a month earlier, and the upstairs apartment was now vacant.
 
 [33]
 
 The owner of the apartment complex testified at the motion hearing that he recognized defendant, Kenneth Green, as the tenant of the upstairs apartment.
 
 [34]
 
 The officers entered the apartment and seized evidence after receiving verbal permission from the owner of the apartment.
 

 The district court denied the defendant’s motion to suppress the evidence, holding that the owner had the apparent authority to consent to the search. The court reasoned the agents’ belief that the upstairs apartment was vacant was “objectively reasonable” based on the facts provided to them and that any mistake made by the agents was a mistake of fact and not of law.
 
 [35]
 

 On appeal, the United States Sixth Circuit Court of Appeals affirmed the district court’s denial of the motion to suppress evidence, stating, “The district court did not clearly err in finding that agents reasonably believed that they had been given consent to search the apartment by individuals with apparent authority to give such consent. Therefore, the search of the upstairs apartment did not violate the Fourth Amendment.”
 
 [36]
 

 In this case, the evidence at the suppression hearing and at trial was insufficient to determine whether the landlord had actual authority over the Knight residence at the time the officers returned to photograph the writing on the wall. But, based on the foregoing cases, we find the landlord at least had apparent authority to consent to the officers’ entry. When the officers returned to the victim’s house days after the search warrant was executed, they knew Mr. Knight, the lessee of the residence, was dead. They also knew that Phillip Knight, who_[2galso lived at the house, was in jail. We find there is a basis for finding the officers believed that authority over the residence had reverted to the owner/lessor and that the owner was authorized to consent to their entry. Based on the foregoing, we find the officers’ warrantless entry of the Knight residence to take photographs not in violation of Knight’s Fourth Amendment right to be free from unreasonable searches and seizures.
 

 In his supplemental brief, Knight argues that the photograph depicting the writing on his bedroom wall was inadmissible because the writing was not authenticated. Specifically, he complains that the State should have produced either expert or lay testimony identifying the handwriting on the wall as his before attributing the writing to him.
 

 Generally, all relevant evidence is admissible.
 
 [37]
 
 “Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by con
 
 *321
 
 siderations of undue delay, or waste of time.”
 
 [38]
 
 Before demonstrative evidence can be admitted at trial, it must be properly authenticated.
 
 [39]
 
 The authentication of evidence refers to the process by which the proponent of the evidence proves that it is what he claims it to be.
 
 [40]
 

 The initial determination regarding admissibility is made by the trial court, based upon La. C.E. art. 901(A), which provides, “The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.”
 

 |21La. C.E. article 901(B), in pertinent part, provides:
 

 Illustrations. By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this Article:
 

 (1) Testimony of witness with knowledge. Testimony that a matter is what it is claimed to be.
 

 (2) Nonexpert opinion on handwriting. Nonexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation.
 

 (3)Comparison by trier or expert witness. Comparison by the trier of fact or by expert witnesses with specimens which have been authenticated.
 

 This Court has recognized that, under La. C.E. art. 901(B)(3), authentication of handwriting may be made by nonexpert opinion or by comparison with authenticated specimens by the trier-of-fact or by an expert witness.
 
 [41]
 
 Although the photograph at issue was simply a likeness of a wall in Knight’s bedroom, and the State did not hold the writing out to be Knight’s, its clear intention was to create an inference that the writing was Knight’s. The photograph had seemingly little relevance otherwise.
 

 The State did not offer any testimony, expert or otherwise, to show whose writing was pictured. Nor did the State present any known handwriting exemplars so that the jurors could make their own comparisons to the writing in the photograph.
 

 In
 
 State v. Guillard,
 

 [42]
 

 this Court held that a letter allegedly written by the defendant to the mother of the victim in an aggravated burglary case was not properly authenticated for admission at trial. In that case, the State purported to authenticate the letter solely through the testimony of its recipient and did not 122present handwriting exemplars from the defendant, expert witnesses to compare exemplars with the letter, or witnesses familiar with the defendant’s writing to vouch for the authenticity of letter.
 
 [43]
 
 This Court found, however, that the trial court’s error in admitting the letter was harmless because the evidence, which included eyewitness testimony, was substantial.
 

 
 *322
 
 In the instant matter, the photograph of the writing on Knight’s bedroom wall was direct evidence of his specific intent to kill or inflict great bodily harm in what was principally a circumstantial evidence case. Knight suggests the writing appeared after the officers executed the search warrant at the house. It is possible to draw such an inference, since Detective Still did not testify at the suppression hearing or at trial that he saw the writing when he entered the house before obtaining the search warrant. Detectives Lloyd and Lawrence, who executed the search warrant, gave no testimony about the writing. Moreover, the videotape of the victim’s residence made during the execution of the search warrant, does not show the part of the wall where the writing appears to be positioned in the photograph. Thus, it is impossible to tell from a viewing of the videotape whether the phrase “Bobb 6 Knight dies becaus [sic] he is the devil ...” was written on the wall at the time of the search.
 

 We find that, although the photograph was improperly admitted into evidence, the error is harmless. The Louisiana Supreme Court has held that “[a]n error is harmless if it is unimportant in relation to the whole and the verdict rendered was surely unattributable to the error.”
 
 [44]
 
 We believe that is the case in this matter.
 

 IgaMr. Bristo saw Knight leave the house he shared with the victim in the middle of the night, carrying a bundle that was later determined to be the victim’s body. Knight abandoned the body at the vacant house across the street. Mr. Bristo further testified that Knight often argued with the victim and that Knight had threatened to harm him. Additionally, as discussed under our review of the evidence for sufficiency to convict, the seriousness of the victim’s injuries was evidence of specific intent to kill or inflict great bodily harm. Based on the foregoing, we find no merit in this assignment of error.
 

 INEFFECTIVE ASSISTANCE OF COUNSEL
 

 In the final counseled assignment of error, Knight argues his trial counsel was ineffective in several respects: 1) she waived opening statement; 2) she did not use all of the available peremptory challenges during jury selection; 3) she did not adequately cross-examine State witnesses; 4) she failed to utilize documents obtained in discovery to present an effective defense; and 5) she failed to demonstrate that the writing on the bedroom wall was not there when the wall was videotaped during the search on September 1, 2000.
 

 The State responds that the record does not support Knight’s contentions, and that he fails to meet his two-part burden under
 
 Strickland v.
 
 Washington,
 
 [45]
 
 A criminal defendant is entitled to effective assistance of counsel under the Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution. To prove ineffective assistance of counsel, a defendant must show both that (1) his attorney’s performance was deficient; and (2) the deficiency prejudiced him.
 
 [46]
 
 An
 
 *323
 
 error is considered prejudicial if it was so serious as to ^deprive the defendant of a fair trial, or “a trial whose result is reliable.”
 
 [47]
 
 To prove prejudice, the defendant must demonstrate that, but for counsel’s unprofessional conduct, the outcome of the trial would have been different.
 
 [48]
 

 In order to prevail, the accused must overcome a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; specifically, the defendant must overcome the presumption that, under the circumstances, the challenged action “might be considered sound trial strategy.”
 
 [49]
 
 An alleged error that is within the ambit of trial strategy does not establish ineffective assistance of counsel, because “opinions may differ on the advisability of such a tactic.”
 
 [50]
 

 An ineffective assistance of counsel claim is best addressed through an application for post-conviction relief filed in the trial court where a full evidentiary hearing can be conducted. But when the record contains sufficient evidence to rule on the merits of the claim and the issue is properly raised by an assignment of error on appeal, it may be addressed in the interest of judicial economy.
 
 [51]
 

 Upon review of Knight’s individual claims of ineffective assistance of counsel, we find that, while the record is sufficient to address some of Knight’s claims, it is not sufficient to address all of the claims. When there is sufficient evidence to consider some, but not all, of the allegations of ineffectiveness of counsel, this Court has declined to address any of the claims, reasoning that the claims are more properly addressed together on post-conviction at an evidentiary | .¿shearing.
 
 [52]
 
 Accordingly, we find the claims of ineffective assistance of counsel made in this appeal by Knight are more properly addressed by the trial court on post-conviction relief and will not be determined herein.
 

 PRO SE ASSIGNMENTS OF ERROR
 

 In addition to the assignments of error briefed by Knight’s appellate counsel, there are two additional errors assigned by Knight in a
 
 pro se
 
 brief to this Court. In the first assignment, Knight asserts that the prosecutor allowed perjured testimony. This assignment of error consists of three parts. Knight first complains that his trial was fundamentally unfair because the prosecutor allowed witnesses to give perjured testimony at trial. Specifically, Knight notes that Detective Still described the blanket in which the victim’s body was wrapped as a “blue comforter, quilt-type thing,” while Dr. Garcia described it in her testimony as a “green and beige quilt.” Knight further complains that Detective Still testified the object that was discovered to be the victim’s body was lying on its stomach, and that “the object’s legs were
 
 *324
 
 sticking up in the air.” Knight points out that the initial police report by Officer Thomas Thompson showed the left side of the object was sticking up in the air. Dr. Garcia testified that she surmised the victim was lying on his back.
 

 Knight states that Mr. Bristo’s testimony at trial, that he saw Knight exit the back door of the victim’s residence and drag the bundle across the street, was contradicted by photographic evidence that showed drag marks near the victim’s front porch.
 

 Knight points to internal contradictions in the testimony rather than newly discovered, extraneous evidence to support his argument. The discrepancies he Incites were known to him at the time of trial, but he failed to make timely objections and allow the trial court to rule on his perjury claim. Since Knight failed to object during trial to the testimony as perjury, he waived his right to assert the error on appeal.
 
 [53]
 
 Accordingly, we decline to review this claim.
 

 Knight further argues his trial was unfair in that the State was allowed to introduce two knives that were determined not to be murder weapons. He maintains that the introduction of weapons that were not proven to be associated with the murder misled the jury and, thereby, prejudiced his case. Again, Knight raises an issue he did not preserve for appellate review. The record shows the knives were admitted at trial without a defense objection. Because Knight failed to make a contemporaneous objection, the issue is not properly before this Court.
 
 [54]
 

 In his final
 
 pro se
 
 claim, Knight makes a general argument that his trial was fundamentally unfair because the trial court 1) refused to appoint a different attorney to represent him; 2) declared two mistrials; 3) ordered that he be committed to a mental hospital and medicated; 4) allowed the prosecutor to proceed unchecked; 5) refused to allow the jury to view the murder scene at night; 6) refused to address his speedy trial motion; 7) excused a juror who asked a key question; and 8) allowed eight years to elapse before proceeding to trial.
 

 Defendant makes the above conclusive statements without offering any supporting authority. All specifications or assignments of error must be briefed, and the appellate court may consider as abandoned any specification or assignment of error that has not been briefed.
 
 [55]
 
 Restating an assigned error in brief without 127argument or citation of authority does not constitute briefing.
 
 [56]
 
 There is nothing in Knight’s list of arguments for this Court to review.
 

 For the reasons stated herein, Phillip Knight’s conviction and sentence are affirmed.
 

 AFFIRMED.
 

 [1]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 

 [2]
 

 . Although it was not revealed at trial, Detective Still testified at the pre-trial hearing on defendant's motion to suppress evidence that he took the photograph (State’s Exhibit 42) sometime after the search warrant was executed.
 

 [3]
 

 .
 
 State v. Hearold,
 
 603 So.2d 731, 734 (La.1992).
 

 [4]
 

 .
 
 Id.
 

 [6]
 

 . La. R.S. 15:438.
 

 [7]
 

 .
 
 State v. Davis,
 
 92-1623 (La.5/23/94), 637 So.2d 1012, 1020.
 

 [8]
 

 .
 
 State v. McFarland,
 
 07-26 (La.App. 5 Cir. 5/29/07), 960 So.2d 1142, 1146,
 
 writ denied,
 
 07-1463 (La.1/7/08), 973 So.2d 731.
 

 [9]
 

 . La. R.S. 14:30.1(A). La. R.S. 14:30.1 A(3) and (4) were amended in the recent legislative session by 2009 La. Acts No. 155, § 1. The Louisiana State Legislature's website (http:// www.legis.state.la.us) shows the effective date of the amendment as August 15, 2009. The amendments modify the definition of second degree murder to include the unlawful distribution of controlled dangerous substances and, thus, do not affect this case.
 
 State v. Kirkland,
 
 01-425 (La.App. 5 Cir. 9/25/01), 798 So.2d 263, 268,
 
 writ denied,
 
 01-2967 (La.10/14/02), 827 So.2d 415.
 

 [10]
 

 .
 
 State v. Draughn,
 
 05-1825 (La.1/17/07), 950 So.2d 583, 593,
 
 cert. denied,
 
 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007);
 
 State v. Weatherspoon,
 
 06-539 (La.App. 5 Cir. 12/12/06), 948 So.2d 215, 220,
 
 writ denied,
 
 07-0462 (La.10/12/07), 965 So.2d 398.
 

 [11]
 

 .
 
 State v. Draughn, supra
 
 (quoting
 
 State v. Neal,
 
 00-0674 (La.6/29/01), 796 So.2d 649, 657,
 
 cert. denied,
 
 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002)).
 

 [12]
 

 .
 
 State v. Watson,
 
 02-1154 (La.App. 5 Cir. 3/25/03), 844 So.2d 198, 205,
 
 writ denied,
 
 03-1276 (La.5/14/04), 872 So.2d 506.
 

 [13]
 

 .
 
 State v. Wallace,
 
 00-1745 (La.App. 5 Cir. 5/16/01), 788 So.2d 578, 584,
 
 writ denied,
 
 01-1849 (La.5/24/02), 816 So.2d 297.
 

 [14]
 

 .
 
 State v. Marshall,
 
 04-3139 (La.11/29/06), 943 So.2d 362, 369.
 

 [15]
 

 . La. R.S. 14:10(1).
 

 [16]
 

 .
 
 State v. Graham,
 
 420 So.2d 1126, 1127 (La.1982).
 

 [17]
 

 .
 
 State v. Gonzalez,
 
 07-449 (La.App. 5 Cir. 12/27/07), 975 So.2d 3, 8,
 
 writ denied,
 
 08-228 (La.9/19/08), 992 So.2d 949.
 

 [18]
 

 .
 
 See, State v. Templet,
 
 05-2623 (La.App. 1 Cir. 8/16/06), 943 So.2d 412, 421.
 

 [19]
 

 .
 
 Schneckloth v. Bustamonte,
 
 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973).
 

 [20]
 

 .
 
 State v. Boss,
 
 04-457 (La.App. 5 Cir. 10/26/04), 887 So.2d 581, 585.
 

 [21]
 

 . La.C.Cr.P. art. 703(D);
 
 State v. Addison,
 
 05-378 (La.App. 5 Cir. 12/27/05), 920 So.2d 884, 891,
 
 writ denied,
 
 06-1087 (La.11/9/06), 941 So.2d 36,.
 

 [22]
 

 .
 
 State v. Long,
 
 03-2592 (La.9/9/04), 884 So.2d 1176, 1179,
 
 cert. denied,
 
 544 U.S. 977, 125 S.Ct. 1860, 161 L.Ed.2d 728 (2005).
 

 [23]
 

 .
 
 State v. Addison,
 
 920 So.2d at 890.
 

 [24]
 

 .A photograph of the wall introduced at trial focuses on the words "Bobb 6 Knight dies becaus [sic] he is the devil....” But the photograph, as well as the videotape taken at the house, shows there was additional writing on the wall.
 

 [25]
 

 .
 
 Schneckloth v. Bustamonte, supra.
 

 [26]
 

 .
 
 United States v. Matlock,
 
 415 U.S. 164, 171 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974).
 

 [27]
 

 .
 
 State v. Green,
 
 376 So.2d 1249, 1250 (La.1979).
 

 [28]
 

 .
 
 Matlock,
 
 415 U.S. at 171, n. 7, 94 S.Ct. at 993.
 

 [29]
 

 .
 
 Chapman v. United States,
 
 365 U.S. 610, 616-17, 81 S.Ct. 776, 780, 5 L.Ed.2d 828 (1961).
 

 [30]
 

 .
 
 Illinois v. Rodriguez,
 
 497 U.S. 177, 188, 110 S.Ct. 2793, 2801, 111 L.Ed.2d 148 (1990);
 
 State v. Gettridge,
 
 08-786 (La.6/6/08), 987 So.2d 247 (per curiam);
 
 State v. Veals,
 
 07-605 (La.App. 5 Cir. 1/22/08), 977 So.2d 1030, 1039,
 
 writ denied,
 
 08-0571 (La.11/26/08), 997 So.2d 543.
 

 [31]
 

 . 102 F.Supp.2d 904 (S.D.Ohio, 2000).
 

 [32]
 

 .
 
 Id.
 
 at 906.
 

 [33]
 

 . Id.
 

 [34]
 

 .
 
 Id.
 
 at 908.
 

 [35]
 

 .
 
 Id.
 
 at 911-12.
 

 [36]
 

 .
 
 Id.
 
 at 906.
 

 [37]
 

 . La. C.E. art. 402.
 

 [38]
 

 . La. C.E. art. 403.
 

 [39]
 

 . La. C.E. art. 901;
 
 State v. Cosey,
 
 97-2020 (La.11/28/00), 779 So.2d 675, 678,
 
 cert. denied,
 
 533 U.S. 907, 121 S.Ct. 2252, 150 L.Ed.2d 239 (2001).
 

 [40]
 

 .
 
 State v. Taylor,
 
 04-90 (La.App. 5 Cir. 5/26/04), 875 So.2d 962, 969,
 
 writ denied,
 
 04-1649 (La.11/19/04), 888 So.2d 193.
 

 [41]
 

 .
 
 Kid Gloves, Inc. v. First Nat'l Bank of Jefferson Parish,
 
 600 So.2d 779, 781 (La.App. 5 Cir.1992).
 
 See also, State v. Juniors,
 
 03-2425 (La.6/29/05), 915 So.2d 291, 329-30,
 
 cert. denied,
 
 547 U.S. 1115, 126 S.Ct. 1940, 164 L.Ed.2d 669 (2006).
 

 [42]
 

 . 04-899 (La.App. 5 Cir. 4/26/05), 902 So.2d 1061,
 
 writ denied,
 
 05-1381 (La.1/13/06), 920 So.2d 233.
 

 [43]
 

 .
 
 Id.,
 
 902 So.2d at 1081-88.
 

 [44]
 

 .
 
 State v. Leger,
 
 05-0011 (La.7/10/06), 936 So.2d 108, 140,
 
 cert. denied,
 
 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2006) (quoting
 
 State v. Koon,
 
 96-1208 (La.5/20/97), 704 So.2d 756, 763,
 
 cert. denied,
 
 522 U.S. 1001, 118 S.Ct. 570, 139 L.Ed.2d 410 (1997)).
 

 [45]
 

 . 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).
 

 [46]
 

 .
 
 Strickland v. Washington, supra; State v. Soler,
 
 93-1042 (La.App. 5 Cir. 4/26/94), 636 So.2d 1069, 1075,
 
 writs denied,
 
 94-0475 (La.4/4/94) 637 So.2d 450 and 94-1361 (La.11/4/94), 644 So.2d 1055.
 

 [47]
 

 .
 
 Strickland v. Washington,
 
 466 U.S. at 687, 104 S.Ct. at 2064;
 
 State v. Serio,
 
 94-131 (La.App. 5 Cir. 6/30/94), 641 So.2d 604, 607,
 
 writ denied,
 
 94-2025 (La.12/16/94), 648 So.2d 388.
 

 [48]
 

 .
 
 Strickland v. Washington,
 
 466 U.S. at 694, 104 S.Ct. at 2068;
 
 State v. Soler,
 
 93-1024, 636 So.2d at 1075.
 

 [49]
 

 .
 
 Strickland v. Washington,
 
 466 U.S. at 689, 104 S.Ct. at 2065.
 

 [50]
 

 .
 
 State v. Singleton,
 
 05-634 (La.App. 5 Cir. 2/14/06), 923 So.2d 803, 811,
 
 writs denied,
 
 06-1208 (La.11/17/06), 942 So.2d 532, 08-2386 (La.1/30/99), 999 So.2d 753.
 

 [51]
 

 .
 
 State v. Taylor,
 
 04-346 (La.App. 5 Cir. 10/26/04), 887 So.2d 589, 595.
 

 [52]
 

 .
 
 See, State v. Allen,
 
 06-778 (La.App. 5 Cir. 4/24/07), 955 So.2d 742, 751-52,
 
 writ denied,
 
 08-2432 (La.1/30/09), 999 So.2d 754;
 
 State v. Cambre,
 
 05-888 (La.App. 5 Cir. 7/25/06), 939 So.2d 446, 460-61,
 
 writ denied,
 
 06-2121 (La.4/20/07), 954 So.2d 158.
 

 [53]
 

 .
 
 State v. Singleton,
 
 05-634 (La.App. 5 Cir. 2/14/06), 923 So.2d 803, 809,
 
 writs denied,
 
 06-1208 (La.11/17/06), 942 So.2d 532, 08-2386 (La.1/30/09), 999 So.2d 753.
 

 [54]
 

 . La.C.Cr.P. art. 841.
 

 [55]
 

 . Rule 2-12.4 of the Uniform Rules, Courts of Appeal.
 

 [56]
 

 .
 
 State v. Lauff,
 
 06-717 (La.App. 5 Cir. 2/13/07), 953 So.2d 813, 819.